STATE, Respondent, v. KRAIMER, Appellant.†

Court of Appeals

No. 78-833-CR. Argued May 24, 1979.—
Decided July 27, 1979.
(Also reported in 283 N.W.2d 438.)

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

420

For the defendant-appellant, there were briefs by *Richard L. Cates,* state public defender and *William J. Tyroler* and *Richard J. Johnson,* assistant state public defenders, with oral argument by *William J. Tyroler.*

For the plaintiff-respondent, there was a brief by *Bronson C. La Follette,* attorney general and *David J. Becker,* assistant attorney general, with oral argument by *David J. Becker.*

Before Voss, P.J., Brown and Bode, J.J.

BROWN, J.  This is an appeal from a manslaughter conviction wherein defendant asserts that the evidence used to convict him was obtained by an unconstitutional search and was therefore tainted.

On May 15, 1978 at 8:25 a.m., Racine police Lieutenant Daniel Elmer received a telephone call from an "emotionally upset" individual who said he had a problem and would call back shortly. Although received at the Racine police department, the call came through the "Helpline," which allows citizens to report crimes while remaining anonymous, if desired.

The same caller telephoned Elmer again at 9 a.m. and once more at 9:20 a.m. Elmer tape recorded both calls. Elmer did not identify himself as a police officer until the third and last call.

During these conversations, the caller stated that he had shot and killed his wife four days earlier. The wife's body was "upstairs" and the defendant wanted to talk to somebody. From the telephone calls, Elmer was able to learn that the caller had four children, and they were home with him. The oldest child, a male, was twelve and the youngest was two. The caller did not mention any names nor did he mention any specific address. The caller advised Elmer that he wanted to get the situation resolved and that he could not live in a house with his wife lying dead upstairs. A meeting was then arranged whereby Elmer and the caller were to meet at a local restaurant in ten minutes. The caller did not show up at the restaurant at the designated time.

Detective Elmer thought the calls might possibly have been a hoax, but he was impressed with the sincerity of the caller because of the caller's emotional state. Therefore, he decided to investigate the matter further.

Detective Elmer's only real lead was the fact that four children, at least one of whom was school age, were at home. Yet, school was in session. The investigation consisted of calling twelve area schools. Police informed the schools that they were interested in learning the names of all twelve-year-old male juveniles who were absent from school and who had three siblings. Two of the siblings might also be school age.

Three possible leads surfaced as a result of discussions with the twelve schools. One of these leads was the family of Larry Kraimer. Detective Gerald Frievault was assigned to check out any possible connection between the phone caller and the Kraimer children not being in school. Frievault arrived at the home and knocked on

the front door of Kraimer's home. There was no answer. Detective Frievault then proceeded to the two neighbors' houses on either side, where he found no one home. He then went to the back door of Kraimer's home, where he observed that one pane of glass was missing in the door. He shouted into the opening that he was a police officer and asked if anyone was home. He received no response. He then drove to a call box to request assistance and returned to the defendant's home. While waiting for assistance, he saw that a neighbor across the street was home. He asked the neighbor if they had seen the Kraimer children and whether anything was unusual at the Kraimer home. The neighbor said that he saw nothing unusual, and he had seen the children playing outside. Sergeant Bob Holton then came to Frievault's assistance, and two officers entered the Kraimer home.

Entry was gained by reaching through the missing pane to turn the doorknob. Frievault observed a partially eaten pizza on the table, children's shoes scattered on the floor and a television set which was on. He announced his presence again once inside the house, but once more received no response.

Frievault and Holton then proceeded up the stairs to the second floor. They announced their presence again while going up the stairs. This time there was a response. Frievault and Holton heard the sound of footsteps coming from the first floor, so they turned around and came back down the stairs. They then saw Kraimer. The first words were spoken by Kraimer. They were directed toward Sgt. Bob Holton. He said, "Hi Bob, thank God you're here. I'm glad it's over." Frievault then asked Kraimer if he was the one who had made the telephone calls. Kraimer said he was. Frievault then asked, "Where is your wife?" Kraimer said, "She's upstairs in the bedroom." Frievault proceeded upstairs to the bedroom and found Mrs. Kraimer's body. When Frievault came back downstairs, he noticed the Kraimer children were present. Kraimer again was the first

person to speak. He said, "I suppose you're going to need the gun." Frievault replied in the affirmative. Kraimer said, "It's in the basement. I'll take you down there." Prior to Mr. Kraimer's going down to the basement, Detective Frievault advised Kraimer that he was under arrest and read him the *Miranda* rights from a card. Kraimer listened and then continued downstairs. Once in the basement, he pointed to a ceiling area and stated, "The gun is up there." Kraimer then led Frievault upstairs and handed him some small envelopes containing letters to other individuals. He told Frievault that, "This will explain everything." Subsequently, the Kraimer home was explored by a police technician. Kraimer later gave a written confession.

Mr. Kraimer was tried for first-degree murder. The jury convicted him of manslaughter. Prior to trial, he had moved to suppress the body, the gun, the letters, the statements and the confession on the ground that they were all products of an illegal, warrantless entry. The motion was denied. Kraimer is now appealing the judgment of conviction on the ground that the court erred in denying his motion to suppress.

The State contents that the warrantless entry into the defendant's home was justified by the exigent circumstances confronting the police at the time of entry. Even if the entry was not justified, the State submits that the particular evidence seized was not related to the entry because it was not obtained through the "exploitation" of the illegal conduct. Rather, all the evidence was freely given to the police by the defendant and was not fruit of the poisonous tree.

## WAS THE WARRANTLESS ENTRY JUSTIFIED BY THE EXIGENT CIRCUMSTANCES?

The fourth amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that

"searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona,* 437 U.S. 385, 390 (1978) quoting *Katz v. United States,* 389 U.S. 347, 357 (1967). One such exception is the "exigent circumstances" or "emergency" situation. The State is arguing that the entry and search in this case comes within this exception.

"The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States,* 115 U.S. App. D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.) *cert. denied,* 375 U.S. 860 (1963) quoted with approval in *Mincey v. Arizona,* 437 U.S. at 392–93. Thus, the fourth amendment does not bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid. *Mincey v. Arizona,* 437 U.S. at 392. Once inside, the police may seize any evidence in plain view during the course of their legitimate emergency activities. *Mincey v. Arizona,* 437 U.S. at 393; *Michigan v. Tyler,* 436 U.S. 499, 509–10 (1978); *Coolidge v. New Hampshire,* 403 U.S. 443, 465–66 (1971).

But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona, supra,* quoting *Terry v. Ohio,* 392 U.S. 1, 25–26 (1968). The trial court found, and we agree, that the entry and search in this case was not justified by any emergency threatening life or limb.

Before the emergency doctrine can be used to justify a warrantless entry and search, the officers must have a

reasonable belief that someone inside the home to be entered is in need of immediate aid. In this case, the officers did not have a reasonable belief that anything had occurred at the Kraimer home. The investigation consisted of calling twelve schools and getting the names of three families that had a twelve-year-old male with three siblings who was not in school. There were, however, forty schools, sixth grade and up, in the district.[1] Twelve was just a fraction of that number. After getting the names of the three families, the police checked out two of the families and found nothing suspicious. Kraimer's family remained. However, before entering the Kraimer home, no attempt was made to contact Kraimer by phone or in any other way determine why his children were not in school. The police had asked neighbors of the Kraimers whether anything unusual was happening at the Kraimer home. The neighbors stated they had seen the Kraimer children outside playing but noticed nothing unusual. Based on these facts, prior to the entry into the Kraimer home, the police had no basis whatsoever to believe that Kraimer had called them or that Kraimer had killed his wife. They had no reasonable belief that someone inside the Kraimer home was dead or in need of aid.

Even assuming the police did have a reasonable belief that Kraimer was the caller, the police had no reason to believe anyone was in need of immediate aid. At no time did the police assert they entered the Kraimer home because they believed Kraimer, his wife or his children were in need of immediate aid. The only information they had was that the wife of the caller was dead and

---

[1] While this fact is not in the record, we take judicial notice of the number of schools sixth grade and up in the Racine Unified School District. The figure was obtained from the Wisconsin Department of Public Instruction.

had been dead for four days. These facts did not constitute an emergency. Immediate entry to save life or limb was not required. The life of the caller's wife could not have been saved by an immediate entry. Under these circumstances a warrant must be obtained. The fact that the officers were just "investigating" and did not have sufficient information to constitute probable cause for a warrant to enter the Kraimer home cannot justify or legitimize the entry. The "exigent circumstances" exception cannot be used to circumvent the probable cause requirement for a warrant under the fourth amendment.

Before an officer may enter and search a home, with or without a warrant, he must have probable cause to believe a crime has been committed, and the person who committed it, or the evidence, is in the home to be entered. A warrant, based on this probable cause, must be obtained unless the officer has reason to believe immediate action is required and life or limb will be threatened during the time it will take to get a warrant if immediate action is not taken.[2] None of these requirements were met in this case. The officers had no probable cause to believe a crime had been committed at the Kraimer home nor did they have a reasonable belief immediate action was required for the safety of anyone. The entry was therefore not within the "exigent circumstances" exception.

The State, however, urges us to uphold the warrantless entry on the ground that the police were investigating a homicide and, therefore, should be permitted to enter the home without a warrant in search of the homicide

---

[2] There are other circumstances justifying a warrantless entry —*i.e.*, destruction of the evidence or a fleeing felon. However, these circumstances are not present in this case and therefore are not discussed.

victim. This "homicide scene" exception to the warrant requirement was recently considered and rejected by the United States Supreme Court in *Mincey v. Arizona*, 437 U.S. at 395. While the court in *Mincey* did state that the police may come upon the scene of a homicide to see if there are other victims in need of aid or if a killer is still on the premises, 437 U.S. at 392, they may only do so if they have probable cause to believe a homicide had been committed and other victims in need of aid or the killer are on the premises. *See Mincey v. Arizona*, 437 U.S. at 392–93.

■■

In this case, the police had no probable cause to believe a homicide had occurred on the Kraimer premises or there were other victims on the premises or the killer was still on the premises. Therefore, the entry into the Kraimer home without a warrant was unlawful.[3]

## EXCLUSION OF EVIDENCE OBTAINED AFTER THE ILLEGAL ENTRY

Having found the entry into the Kraimer home was unlawful, the final question presented is whether the evidence obtained subsequent to the entry must be suppressed as the fruits of an unlawful entry. The evidence obtained consisted of a statement made by Kraimer, the dead body, the murder weapon and bullets, letters written by Mr. Kraimer allegedly explaining why he killed his wife and a confession.

---

[3] At trial, the district attorney argued and the court held that the entry was lawful because the police had a reasonable belief that a burglary was in progress or had recently been committed on the premises. The State has not argued this issue on appeal in support of the trial court's ruling. The argument is simply without merit. The police had absolutely no probable cause to believe a burglary had been committed or was in progress. The only fact they had was a broken window.

In *Wong Sun v. United States,* 371 U.S. 471 (1963), Wong Sun and a codefendant, James Wah Toy, were found guilty of fraudulently and knowingly transporting and concealing illegally imported heroin. Based on information federal agents had obtained through surveillance, they arrested an individual named Hom Way. Hom Way told federal agents that he had bought an ounce of heroin from a person known to him as "Blackie Toy," the proprietor of a laundry on Leavenworth Street. Six or seven agents went to a laundry on Leavenworth Street named "Oye's Laundry" which was operated by Toy. The agents rang the bell and told Toy they were calling for laundry and drycleaning. Toy told them to come back at 8 a.m. when he opened. The agents showed their badges, and Toy slammed the door and ran. The agents followed Toy into his bedroom where they arrested and handcuffed him. After being handcuffed, Toy made some statements which were later used against him. The agents had no arrest or search warrant when they entered Toy's laundry.

On appeal, the United States Supreme Court held the warrantless entry into Toy's laundry and the arrest of Toy were illegal. The major issue presented to the Court was whether the statements obtained immediately after the arrest were nevertheless admissible or whether they were "fruits" of the agents' unlawful action. The government had argued that the statements were admissible because they were the result of "an intervening independent act of a free will." 371 U.S. at 486. The Court, however, rejected this argument and held that the statements were the fruit of the illegal actions and as such inadmissible. The Court stated:

This contention, however, takes insufficient account of the circumstances. Six or seven officers had broken the door and followed on Toy's heels into the bedroom where

his wife and child were sleeping. He had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that Toy's response *was sufficiently an act of free will to purge the primary taint of the unlawful invasion.* [Emphasis added.] [Footnote omitted.] 371 U.S. at 486.

Thus, the ultimate question to be determined in any case where evidence is obtained as a result of unlawful actions by the police is whether it is sufficiently disconnected or free from the primary taint of the unlawful invasion. The mere fact that the arrest was illegal does not automatically exclude all evidence obtained from the persons arrested thereafter. Statements received from Wong Sun several days later were held admissible even though his arrest was found to be unlawful. They were the product of a free will untainted by the initial unlawful action. 371 U.S. at 491.

In determining whether particular evidence was obtained by means sufficiently disconnected or free from the primary taint of the unlawful police action, the policies behind the fourth amendment and the exclusionary rule must be kept in mind. *Brown v. Illinois,* 422 U.S. 590, 599–602 (1975). The primary purpose of the exclusionary rule is to prevent police exploitation of fourth amendment violations. *Mapp v. Ohio,* 367 U.S. 643 (1961). The exclusionary rule was applied to "fruits of the poisonous tree" in *Wong Sun* to prevent police exploitation of violations of the fourth amendment. *Wong Sun v. United States,* 371 U.S. at 486. Thus, police exploitation of their illegal acts is a critical factor in determining whether evidence obtained subsequent to illegal police conduct is sufficiently purged of the primary taint. As capsulized by the Fifth Circuit Court of Appeals in *United States v. Fike,* 449 F.2d 191, 193 (5th Cir. 1971) :

The "fruit of the poisonous tree" doctrine is explained at length in *Wong Sun v. United States*, 1963, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed.2d 441. Basically, the doctrine serves to exclude from evidence not only the direct products but also the indirect products of illegal invasions. The Court in *Wong Sun*, however, recognized that not all evidence is "fruit of the poisonous tree" requiring exclusion merely because it would not have been discovered "but for" the primary illegal invasion.

Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been *come at by exploitation of that illegality* or instead by means sufficiently distinguishable to be purged of the primary taint." (original citations omitted) 371 U.S. at 488, 83 S. Ct. at 417. [Emphasis added.]

In the present case, the statements and evidence obtained after the unlawful entry can be separated into three categories: (1) The statements made and physical evidence obtained (namely the body) before Kraimer was placed under arrest; (2) the statements made and physical evidence obtained after arrest, namely the gun, bullets and letters, and (3) the written confession. If the statements made by Kraimer prior to his arrest were sufficiently purged of the taint of the unlawful entry, the seizure of the body was lawful. Based on the statements and the body, the police had probable cause to arrest—making the arrest lawful. Once a lawful arrest existed and *Miranda* warnings were given, the remaining statements and evidence obtained were admissible. Thus, the issue is whether Kraimer's statements, "Hi Bob, thank God you're here. I'm glad it's over," his affirmative answer that he was the caller, and his statement that his wife was upstairs in the bedroom were the "fruits" of the unlawful entry or were the product of Kraimer's "free will" unaffected by the initial illegal entry.

Before we may begin to analyze this issue, however, a distinction must be made between statements made which

are found to be voluntary for fifth amendment purposes and statements which are the product of a person's "free will" so as to be sufficiently purged of the taint of the unlawful conduct under the fourth amendment. Statements made to the police may be voluntary for fifth amendment purposes, regardless of prior police misconduct, but their voluntariness for fourth amendment purposes is merely a threshold requirement. *Dunaway v. New York,* 47 U.S. U.S.L.W. 4635, 4640 (June 5, 1979) ; *Brown v. Illinois,* 422 U.S. at 604. Indeed, if the fifth amendment had been violated, the fourth amendment issue would not have to be reached. But the defendant here does not claim that his fifth amendment rights were violated. His statements were voluntary for fifth amendment purposes. The issue is whether they were freely given for *fourth amendment purposes.* Under the fourth amendment, the relevant inquiry is "whether [the] statements were obtained by exploitation of the illegality of [the police conduct]." *Brown v. Illinois,* 422 U.S. at 600. If there is a close causal connection between the illegal conduct and the statements, the statements are inadmissible under the fourth amendment. *Dunaway v. New York,* 47 U.S.L.W. at 4640; *See Brown v. Illinois,* 422 U.S. 603–04. To permit the admission of a statement and evidence obtained by police exploitation of their own illegal conduct would destroy the policies and interests of the fourth amendment. *Dunaway v. New York,* 47 U.S.L.W. at 4640–41; *Brown v. Illinois,* 422 U.S. at 602.

In both *Dunaway* and *Brown,* the defendants had been unlawfully arrested and taken to the police station. They were then given *Miranda* warnings and made confessions. The court in both cases held that the confessions were unlawfully obtained and inadmissible under the fourth amendment. In *Brown,* the court held that the giving of *Miranda* warnings did not *per se* make the statements a product of the defendant's free will purging

the original taint of the unlawful arrest. The court then set forth the standard to be used in determining, based on the facts, whether the statements were "freely" made.

The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . *and, particularly, the purpose and flagrancy of the official misconduct are all relevant. . . .* The voluntariness of the statement is a threshold requirement. . . . And the burden of showing admissibility rests, of course, on the prosecution. [Emphasis added.] [Citations omitted.] *Brown v. Illinois,* 422 U.S. at 603–04.

Based on this standard, as reiterated and reaffirmed in *Dunaway,* we think the State has met its burden that the statements made were voluntary under the fifth amendment and were the product of Kraimer's free will for purposes of the fourth amendment sufficient to purge them of the taint of the illegal entry.

Kraimer's statements were made almost contemporaneously with him seeing the officers in his home. No *Miranda* warnings were given because Kraimer spoke immediately, before the officers had a chance to say anything. There were no intervening circumstances, but Kraimer never objected or acted annoyed that the officers were in his home. In fact, he acted relieved. Kraimer was not placed under arrest and roughly handcuffed by police, as in *Wong Sun, Brown* and *Dunaway.* He was not chased into a bedroom in the early morning hours by six or seven police officers as in *Wong Sun.* He was not

illegally arrested and taken to the police station for in-custody interrogation as in *Brown* and *Dunaway*. Instead, the testimony shows that Kraimer calmly proceeded to sit down on a couch and said, "Hi Bob, thank God you're here. I'm glad it's over." These statements were not made by a man threatened or intimidated by police presence in his home. They were made by a man eager to unburden his soul. Kraimer provided no testimony, at any time, indicating he made the statements to the police because he was acquiescing to police authority and felt the police were going to find the body anyway. Frievault's questions following Kraimer's initial statement show that his questions were investigatory in nature rather than accusatory. At no time did the police in any way take advantage of their illegal entry or exploit their presence in the Kraimer home. They did not have to. Everything was volunteered by Kraimer. Under these circumstances, we think Kraimer's statements and actions were "sufficiently an act of free will to purge the primary taint of the unlawful invasion" for purposes of the fourth amendment under *Wong Sun, Brown* and *Dunaway*. They were, therefore, lawfully obtained by the police and admissible.

Having found Kraimers statements prior to arrest were purged of the taint of the illegal entry, the subsequent seizure of the body was lawful. Kraimer consented to the seizure. Once they had lawfully seized the body, Kraimer was lawfully placed under arrest. After the lawful arrest and *Miranda* warnings, all statements made and physical evidence obtained were freely and voluntarily given, were not tainted by an unlawful entry and were therefore lawfully seized and admissible.

*By the Court.*—Judgment affirmed.