STATE of Wisconsin, Plaintiff-Respondent,†

v.

Scott C. ANDERSON, Defendant-Appellant.

Court of Appeals

*No. 90–0125–CR. Oral argument November 14, 1990.—Decided January 16, 1991.*

(Also reported in 466 N.W.2d 201.)

† Petition to review granted.

309

On behalf of the defendant-appellant, there were briefs and oral argument by *Terry W. Rose* of *Rose & Rose* of Kenosha.

On behalf of the plaintiff-respondent, there was a brief by *Donald J. Hanaway,* attorney general, and *Maureen McGlynn,* assistant attorney general. There was oral argument by *Maureen McGlynn.*

Before Nettesheim, P.J., Brown and Scott, JJ.

BROWN, J. Scott C. Anderson appeals a judgment of conviction for two counts of burglary arguing that the evidence obtained from his confession and consent to search his garage was tainted by two prior warrantless searches. Because we find that the confession and resulting search were not sufficiently attenuated from the prior illegal searches, we reverse the conviction.

Between February 3 and 6, 1989, a series of burglaries occurred to a storage garage in Kenosha rented by William Hyde. The investigating police officer found marks in the fresh snow leading from the garage to an

area in front of some houses less than a block away, but the marks disappeared where the snow had been shoveled from the sidewalk.

The officer began checking for information at the houses close to where the marks in the snow disappeared. While knocking on the neighbor's door next to Anderson's house, the officer noticed a shopping cart lying on top of the fresh snow in Anderson's backyard beside the garage. The officer realized the cart had been put there after it snowed and concluded that the marks he had seen in the snow looked like they were made with a shopping cart. Therefore, he went back to the storage garage to ask Hyde whether a shopping cart was one of the items stolen from him. Hyde and the officer then returned to the neighbor's driveway where Hyde viewed the shopping cart and said he believed it was his.

The officer called two police detectives who knocked on the back door of Anderson's house. Only Anderson's fifteen-year-old daughter was home. The detectives told her a burglary had occurred in the area and that the shopping cart in the backyard appeared to be one of the items taken. The detectives asked her if anything was missing from the Anderson garage and whether she would like them to "check her garage." After Anderson's daughter took them to the garage, they asked her permission to bring Hyde into the backyard and the garage. She consented. Because he could inspect the shopping cart more closely and observe it had a broken handle, Hyde identified the cart as his. He also identified some of the items in the garage as his.

None of the allegedly stolen items was seized by police during this first search. Instead, one of the detectives went to get a search warrant while the other watched the house from the police car. When the first detective returned, the two detectives again went to the

313

house. No one answered the door, so they waited in the car until Anderson's wife returned from work. The detectives did not serve a search warrant but asked to speak to Mr. Anderson. Anderson's wife phoned him at a tavern and he told her he would come home. When he called later from a second tavern, Mrs. Anderson led the police to that tavern to talk to him. Since he was no longer there, the police returned to the Anderson home and executed what they claimed was a search warrant, but which was actually the affidavit signed by a judge. The detectives searched the house and garage and took the items from the garage that they believed belonged to Hyde.

The next morning, the same detectives went to Anderson's house to arrest him on an outstanding warrant for a traffic violation and to question him about the burglary. At the police station, Anderson received *Miranda* warnings, signed a waiver of his rights and then gave an oral statement to the officers concerning the burglary. At some point, the officers showed Anderson the items they had taken from his garage the night before. Anderson volunteered that there were additional items that the police had not recovered. After Anderson gave his oral statement, the officers and Anderson returned to Anderson's garage to get the additional stolen items and then came back to the police station to type Anderson's statement for his signature. In the statement, Anderson claimed that he thought the stolen items had been abandoned in a building that was about to be torn down and "the items were free for the taking." He also offered to make restitution to the owner of the property to settle the matter.

Before trial, Anderson moved to suppress his confession and the evidence obtained from his garage. The trial court held the first search to be illegal because testi-

mony indicated that Anderson's daughter "did not have common authority over the premises and therefore was not legally in a position to give consent to the police to make the search." The court suppressed the evidence from the second search because the affidavit attempted to establish probable cause by means of the items found in the first illegal search of the garage. However, the court held that Anderson's confession and the third search of the garage were valid because they were not tainted by the first two illegal searches. It is the court's decision on the confession and third search that is at issue in this appeal.

The court reasoned that the shopping cart was in plain view when the officer initially observed it in Anderson's backyard and would have led to a continuing police investigation of Anderson, even without two illegal searches of his garage. The court further reasoned that Anderson's testimony failed to establish police exploitation of the two illegal searches, since Anderson's testimony simply used the phrase, "they as much as told me," to summarize what Anderson believed was the conversation with the police regarding the evidence they already had and how it would be better for him if he cooperated.

We review the trial court's use of the inevitable discovery doctrine and the court's alternative holding that Anderson's confession and resultant search were sufficiently attenuated from the first two illegal searches. Inevitable discovery and attenuation present questions of constitutional law since they are exceptions to the exclusionary rule protecting fourth amendment interests. Questions of law require independent appellate review. *State v. Turner,* 136 Wis. 2d 333, 344, 401 N.W.2d 827, 832 (1987).

We observe at this point that the state only cursorily defended the inevitable discovery ruling in its brief and at oral argument. Instead, it devoted most of its attention to its attenuation argument. We will discuss each in turn, beginning with inevitable discovery.

## INEVITABLE DISCOVERY

The first question in the inevitable discovery discussion is: did the shopping cart establish probable cause for the search of Anderson's garage? If so, would that probable cause have led to an ongoing police investigation of Anderson, inevitably leading to Anderson's confession and to a discovery of the stolen goods during the third search, even without the two warrantless searches of Anderson's garage? Included in this analysis is consideration of whether the shopping cart was in a constitutionally protected area, the curtilage of Anderson's house. *See Oliver v. United States,* 466 U.S. 170, 180 (1984). Additionally, the curtilage was a fenced-in backyard, which may have greater protection than the front curtilage because it often cannot readily be viewed by the public passing the house. *State v. Walker,* 154 Wis. 2d 158, 184–85 n.16, 453 N.W.2d 127, 138 (1990).

The initial inquiry is whether the shopping cart's position in the curtilage protected it from use as evidence. We conclude that the shopping cart was legitimately viewed by police, even though it was in a protected area. At the time of the initial observation, the officer was legitimately knocking on the neighbor's door to investigate the burglaries when he turned and saw the shopping cart. The shopping cart was in plain view. An officer's mere observation of an item left in plain view generally involves no fourth amendment search. *Horton*

*v. California,* 495 U.S. —, 110 S. Ct. 2301, 2306 n.5 (1990). The police cannot reasonably be expected to avert their eyes from evidence that could have been observed by any member of the public. *California v. Greenwood,* 486 U.S. 35, 41 (1988). Any member of the public standing in the neighbor's driveway could have observed the shopping cart in Anderson's backyard.

The officer's return to the driveway with the owner of the cart presents a different problem than the officer's initial observation of the shopping cart. The officer was no longer attempting to question the neighbor about the shopping cart. He was conducting an investigation of the cart. We conclude that the investigation was justified because what a person knowingly exposes to the public is not a subject of fourth amendment protection. *Katz v. United States,* 389 U.S. 347, 351 (1967).

We are not persuaded that Anderson exhibited an expectation of privacy by putting the shopping cart in his backyard. One of the factors to be considered in deciding whether the curtilage is protected is the steps taken by the resident to shield the area from observation by people passing by. *Walker,* 154 Wis. 2d at 183–84, 453 N.W.2d at 138, *citing United States v. Dunn,* 480 U.S. 294, 301 (1987). The record shows that Anderson's fence was the type that allowed the shopping cart to be seen by anyone standing in the neighbor's driveway. Thus, it was not a sight-obstructing fence and Anderson's expectations of privacy were not violated. A person's subjective expectations of privacy manifested by the kind of fence constructed is one of the questions to be considered in fourth amendment analysis. *See California v. Ciraolo,* 476 U.S. 207, 211 (1986). Additionally, we note that Anderson left the shopping cart outside the garage.

Therefore, he did not have the same expectation of privacy for the cart as he did for any items which he may have put in the garage.

Because the officer's observation and continuing investigation of the shopping cart were legitimate, we conclude that the owner's tentative identification of the shopping cart, combined with the possibility that the marks in the snow were made by a shopping cart, was sufficient evidence to establish probable cause for a search warrant of Anderson's house and garage. Probable cause is a practical, nontechnical conception. *Illinois v. Gates,* 462 U.S. 213, 231 (1983). It turns on the assessment of probabilities in particular factual contexts. *Id.* at 232. The scale tips in favor of the probability that the shopping cart was stolen from Hyde's storage garage and was used to transport other stolen items which were concealed on Anderson's property.

Although probable cause for a search was established by the shopping cart, we cannot agree that the shopping cart can be pushed down the route of the inevitable discovery doctrine to save Anderson's confession and resultant third search of the garage. The doctrine of inevitable discovery is not an open door through which the fruits of all defective searches may be transformed into admissible evidence. *State v. Kennedy,* 134 Wis. 2d 308, 318, 396 N.W.2d 765, 768 (Ct. App. 1986).

The inevitable discovery doctrine depends on an untainted independent source which would likely have led the police to the same conclusion they reached by illegal methods. In the leading case for the inevitable discovery doctrine, the independent source was a police-citizen search party consisting of two hundred volun-

teers assigned to specific grid areas to look for the body of a little girl who was missing and presumed murdered. *Nix v. Williams,* 467 U.S. 431, 435 (1984). In *Nix,* the Supreme Court admitted the defendant's tainted confession about where the body was located because it concluded that the police would inevitably have discovered the body by means of their large-scale, independent search efforts. *See id.* at 448–50.

In the instant case, although the state did not fully develop the argument, it intimates that the police investigation which might have ensued from the officer's view of the shopping cart over Anderson's fence is similar to the ongoing police investigation in *Nix.* The problem is that there was no independent police investigation in this case, as there was in *Nix.* Rather, there was one continuing investigation here. While in *Nix* there were two separate investigational paths, here there was but one continuing path. Although the investigational pathway in this case was originally based on valid probable cause, it became tainted in the course of two subsequent illegal searches. The doctrine thus espoused is one of inevitable investigation, not inevitable discovery. To equate discovery based on an untainted independent source with investigation based on a tainted source would transform the inevitable discovery doctrine into permission for the police to conduct a fishing expedition using tainted evidence as their bait. That strikes at the very heart of fourth amendment protections.

## ATTENUATION

The state focuses mainly on an attenuation argument. Attenuation analysis must answer the question whether the disputed evidence has been acquired by

exploitation of the primary illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *State v. Kraimer,* 91 Wis. 2d 418, 432, 283 N.W.2d 438, 444 (Ct. App. 1979), *aff'd,* 99 Wis. 2d 306, 298 N.W.2d 568 (1980), *cert. denied,* 451 U.S. 973 (1981).

The state contends that the test for attenuation is not a "but for" test, because that is a subjective test which considers the psychological impact on the defendant of a constitutional violation. The state cites *Oregon v. Elstad,* 470 U.S. 298 (1985), for the proposition that a confession is admissible in spite of the subjective pressure to confess stemming from a prior constitutional violation.

The proper attenuation test, according to the state, is an objective test developed in *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975), and *Kraimer,* 91 Wis. 2d at 434, 283 N.W.2d at 445-46. It claims that this four-part test breaks any possible link between the two illegal searches and Anderson's confession and consent to the third search. The state argues: first, Anderson's confession and consent were voluntary because he received *Miranda* warnings and he offered to let police see the additional stolen items in his garage. Second, there was a lack of temporal proximity to the illegal searches since the police questioning of Anderson occurred a day after the first two searches. Third, there were intervening events because Anderson's wife talked to him after the illegal searches. Fourth, the illegal searches did not represent flagrant police misconduct since police showed a good faith effort to get a search warrant.

We are not persuaded. First, in citing *Oregon v. Elstad* the state confuses the psychological impact of fourth amendment violations with the impact of fifth amendment violations. In *Elstad,* the United States

Supreme Court concluded that the voluntariness of a confession with proper *Miranda* warnings was not affected just because there was subjective pressure for the defendant to confess stemming from a prior voluntary confession given without *Miranda* warnings. *See Elstad,* 470 U.S. at 309–14. The issue in *Elstad* was whether the exclusionary rule should invalidate a confession when there is a prior *fifth* amendment violation. The issue here is whether the exclusionary rule should invalidate the confession because of a prior *fourth* amendment violation. The prophylactic purposes of the exclusionary rule are different for each amendment. Therefore, we conclude that *Elstad* is not precedent for this case and psychological impact is a factor to be considered in evaluating whether a confession is tainted by a prior fourth amendment violation.

Having made this determination, it strains credibility to believe that Anderson spontaneously volunteered information about the burglary and consented to a search of his garage uninfluenced by the knowledge that police searched his garage twice the day before they questioned him. Furthermore, the record indicates that at the police station, the police confronted Anderson with the results of the two prior searches. It is unclear whether this occurred before or after Anderson's confession, but it is undisputed that it occurred before he volunteered that there were additional stolen items in his garage and before he consented to a third search. Thus, we conclude that the police exploited their illegal searches in obtaining Anderson's confession and subsequent consent for a third search.

We are similarly unpersuaded by the state's use of the attenuation test from *Brown v. Illinois.* First, while

*Miranda* warnings are sufficient to establish voluntariness for fifth amendment purposes, they are not sufficient to purge the taint of a fourth amendment violation. *See Brown,* 422 U.S. at 601–03. Second, there is no bright line test for temporal proximity which declares that a new day erases the taint of illegal police activity the previous day. Rather, temporal proximity requires a case-by-case determination. The police arrived at Anderson's house to question him the second day before Anderson was even out of bed. Anderson told the detectives he was planning to call them when he woke up and one of the detectives testified that he believed this was because Anderson had a copy of the affidavit served the previous day. Thus, we conclude that there was temporal proximity between the illegal searches and Anderson's confession and third search because the investigation the second day was part and parcel of the first day's investigation. Third, Anderson's conversation with his wife is not an intervening event. It aggravates rather than removes the taint. Anderson undoubtedly would have learned from the conversation that the police had twice searched his garage, and he would have seen the affidavit listing the stolen items the police had already seized. Fourth, even if the police conducted the first two searches in good faith, this court cannot entertain a good faith analysis absent direction from our supreme court. *State v. Grawien,* 123 Wis. 2d 428, 431–32, 367 N.W.2d 816, 817–18 (Ct. App. 1985). Thus, the state's attenuation argument fails.

At oral argument, the state proposed that an attenuation analysis was not even necessary in light of a recent case decided by the United States Supreme Court. *See New York v. Harris,* 495 U.S. —, 110 S. Ct. 1640 (1990). According to the state, the rule of *Harris* is that the admissibility of a confession is unaffected by a prior

fourth amendment violation. We disagree with the state's broad reading of *Harris.*

We read *Harris* as dealing with the issue the state tried to read into *Oregon v. Elstad*—that is, the impact of a prior fourth amendment violation on the admissibility of a confession. We understand *Harris* to hold that a prior fourth amendment violation does not automatically invalidate a confession. Only if the confession is a product of the fourth amendment violation will it be invalidated. Thus, *Harris* is simply a reiteration of the familiar attenuation principle that a confession is not "fruit of the poisonous tree" if it is not the result of police violation of the fourth amendment.

In *Harris,* the fourth amendment violation was a warrantless arrest of the defendant in his home, which violated *Payton v. New York,* 445 U.S. 573 (1980). The Supreme Court ruled that Harris's statement at the police station was not the product of a warrantless arrest because there was independent probable cause to arrest. *Harris* at 1644–45. Nor was the confession the fruit of having been arrested in the home rather than someplace else. *Id.* Therefore, the fourth amendment violation had no bearing on Harris's confession which was thus admissible.

*Harris* does not speak to this case. We conclude that Anderson's confession and consent were the products of the fourth amendment violation because Anderson would not have confessed or consented to the third search of his garage if the police had not already searched his garage twice without a warrant. Therefore, we reverse the judgment of conviction; we conclude that Anderson's motion to suppress his confession and the

evidence obtained from the third search should have been granted.

*By the Court.*—Judgment reversed.