STATE of Wisconsin, Plaintiff-Respondent,†

v.

Jason PHILLIPS, Defendant-Appellant.

Court of Appeals

*No. 95–2912–CR. Submitted on briefs January 22, 1997.—Decided March 26, 1997.*

(Also reported in 563 N.W.2d 573.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Arthur B. Nathan* of *Nathan Law Office, S.C.* of Racine.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Paul Lundsten*, assistant attorney general.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

SNYDER, P.J. Jason Phillips appeals from a judgment of conviction for possession of THC (marijuana) as a repeat offender in violation of § 161.41(3r), STATS., 1993-94. Phillips contends that the trial court erred when it denied his motion to suppress his statements to police and the physical evidence obtained during a warrantless search. We hold that the warrantless search of Phillips' living quarters was in violation of his Fourth Amendment protections, and, consequently, the statements he made and the physical evidence obtained during that search must be suppressed. We therefore reverse the judgment of conviction and remand for further proceedings consistent with this opinion.

Three agents from the metro drug unit of the Racine County Sheriff's Department went to Phillips' home. Based on information the agents possessed from a confidential informant alleging that Phillips was involved in the sale of marijuana, the agents were pursuing a "knock and talk" encounter. According to Agent Joseph Zblewski, upon their arrival the agents saw an individual they believed to be Phillips at the rear of the residence. The agents then observed this individual descend an exterior stairwell to an area they believed to be a cellar.

According to the testimony of the agents, they approached the open cellar doors at the top of the stairwell and Zblewski called, "Hey, Jason." Phillips responded by coming to the doorway at the bottom of the stairwell.[1] Both the exterior cellar doors and the

---

[1] The facts of the encounter are disputed and there are discrepancies among the individual agents regarding when and where consent to search the bedroom area of the basement was

door at the base of the stairs were open. Zblewski walked down the stairs while identifying himself as a drug agent, continuing past the door at the base of the stairs and into the basement area.[2]

Zblewski admitted at the suppression hearing that he never received permission from Phillips to enter the basement. Instead, he stated that Phillips may have "taken a step or two back because we had two other agents along as well to allow us all into there." The area which the agents entered was a basement storage area and adjacent to it was a closed door which led to Phillips' bedroom.

At this point, Zblewski stated that he explained to Phillips that they had information that he had drug paraphernalia and/or marijuana in the residence. According to Zblewski, Phillips admitted that he had those items in his bedroom. Zblewski then asked Phillips if they could collect any drug paraphernalia because Phillips was in violation of the law for possessing it. Zblewski testified that Phillips opened the door to his bedroom and walked inside. The agents followed him in while he retrieved the marijuana and pointed out numerous items of drug paraphernalia to them.

---

obtained from Phillips. However, we will not set aside findings of fact by a trial court unless they are clearly erroneous. *See* § 805.17(2), STATS. We independently determine, however, whether those facts satisfy the constitutional requirement of reasonableness. *See State v. Johnson,* 177 Wis. 2d 224, 231, 501 N.W.2d 876, 878 (Ct. App. 1993).

[2] There was testimony from Agent Brian Londre that at some point prior to the entry into the basement, "Agent Zablewski [sic] came to me and said he had verbal permission to search the residence from Jason." However, that was contradicted by Zblewski's own testimony, and the trial court found that the warrantless entry into the basement was without consent.

Zblewski admitted that the agents had not received verbal permission to enter Phillips' bedroom; they merely assumed permission to follow him into the bedroom.[3]

Because the bedroom was crowded with the presence of the three agents and Phillips, Zblewski testified that he asked for and received permission for the other two agents to continue the search of the bedroom. Zblewski and Phillips then left the bedroom. Zblewski testified that once outside the bedroom, he engaged Phillips in conversation; during that conversation Phillips denied dealing marijuana, but made several incriminating statements regarding his personal use of the substance and stated that he had previously grown marijuana behind the house.

At the conclusion of their search, the agents confiscated 11.5 grams of marijuana, pipes and other drug paraphernalia. They informed Phillips that he would receive a citation in the mail for possession of the above items. Zblewski stated that Phillips was not placed under arrest, handcuffed or given *Miranda* warnings by the agents.

In a pretrial proceeding, Phillips filed a motion to suppress his statements made to Zblewski and the physical evidence obtained during the search. The trial court denied the motion. Phillips subsequently pled no contest to possession of marijuana as a repeat offender. He now appeals, claiming that the trial court erred in failing to suppress the results of the warrantless search.

---

[3] The trial court found Zblewski's testimony that he believed he had permission to enter the bedroom to be credible. However, "consent 'cannot be found by a showing of mere acquiescence.' " *Johnson*, 177 Wis. 2d at 234, 501 N.W.2d at 880 (quoted source omitted).

██

Phillips contends that the agents conducted an illegal search in violation of the Fourth Amendment and art. I, § 11 of the Wisconsin Constitution. He argues that the agents did not possess valid consent to perform a warrantless search of his living quarters. This presents a question of constitutional fact and as such is decided without deference to the trial court. *See State v. Arroyo,* 166 Wis. 2d 74, 79, 479 N.W.2d 549, 551 (Ct. App. 1991). A reviewing court is duty bound to "apply constitutional principles to the facts as found in order to ensure that the scope of constitutional protections does not vary from case to case." *See State v. Turner,* 136 Wis. 2d 333, 344, 401 N.W.2d 827, 832 (1987).

Evidence seized during a warrantless search of one's home is inadmissible unless there is a well-delineated, judicially recognized exception to the warrant requirement. *See State v. Johnson,* 177 Wis. 2d 224, 231, 501 N.W.2d 876, 879 (Ct. App. 1993). Two recognized exceptions to this clear rule against admitting evidence seized from a warrantless search are exigent circumstances and consent. *See State v. Douglas,* 123 Wis. 2d 13, 22, 365 N.W.2d 580, 584 (1985). In this case, arguments have focused on the consent exception. If the State asserts the consent exception, it bears the burden of " 'proving by clear and positive evidence the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied.' " *See Johnson,* 177 Wis. 2d at 233, 501 N.W.2d at 879 (quoted source omitted).

██

In analyzing the voluntariness of the consent, a court must look at the totality of the circumstances to

determine whether there was coercion. *See id.* Additionally, we must separate the factual determinations made by the trial court from its conclusions of law and apply the appropriate standard of review to each one.[4] *See DOR v. Exxon Corp.*, 90 Wis. 2d 700, 713, 281 N.W.2d 94, 101 (1979), *aff'd*, 447 U.S. 207 (1980). Here, the trial court determined that "there [was] no doubt that [the agents] did not have actual consent to go into the basement area." We agree. The issue then turns on the State's claim that Phillips' subsequent consent to the search of his living quarters was voluntary, thereby removing the taint of the initial illegality. We now focus our analysis on that question.

In *Brown v. Illinois*, 422 U.S. 590, 602 (1975), the Supreme Court considered the question of what was required "[i]n order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken." The Court noted that *Wong Sun v. United States*, 371 U.S. 471 (1963), required "not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' " *Brown,* 422 U.S. at 602 (quoted source omitted). The issue is whether the connection between the illegal police activity and a later statement has " 'become so attenuated as to dissipate the taint.' " *See id.* at 598 (quoted source omitted).

In Wisconsin, the attenuation theory was applied in *State v. Anderson,* 165 Wis. 2d 441, 477 N.W.2d 277 (1991). The court there noted that "[t]he primary concern in attenuation cases is whether the evidence

---

[4] We recognize that this position is contrary to the State's view that consent is a "question of fact that an appellate court will not overturn unless clearly erroneous."

objected to was obtained by exploitation of a prior police illegality or instead by means sufficiently attenuated so as to be purged of the taint." *Id.* at 447-48, 477 N.W.2d at 281. If a defendant's statement and consent to search were obtained by exploitation of prior illegal law enforcement activity, then any statements and evidence obtained during a search must be excluded. *See id.* at 448, 477 N.W.2d at 281.

Under the attenuation theory, the following factors must be considered: (1) the temporal proximity of the official misconduct and the subsequent statements by a defendant; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See id.* We conclude that the instant case fails under the application of each of these factors.

When applying the temporal proximity factor, we must consider both the amount of time between the police misconduct and the conditions that existed during that time. *See id.* at 449, 477 N.W.2d at 281. In *Brown*, the Court noted that there were less than two hours between the defendant's illegal arrest and his first statement to police, and that there was no intervening event of any significance during that time span. *See Brown*, 422 U.S. at 604. The Court concluded that the defendant's first statement was inadmissible under the reasoning of *Wong Sun*. *See Brown*, 422 U.S. at 604-05. The Court also determined that a second statement "was clearly the result and the fruit of the first," *see id.* at 605, bolstered as it was by the defendant's anticipation of leniency in exchange for his cooperation with the arresting officers and the fact that he had

already made one statement he believed to be admissible. *See id.* at 605 n.12.

In the present case, Phillips' alleged consent to the search of his living quarters followed almost immediately upon the heels of the agents' warrantless entry into the basement. During the moments between the entry and the purported consent, Phillips was in the confines of a storage area, in the presence of three agents, at least one of whom had just told him that they had information that he had drug paraphernalia or marijuana there. When Phillips admitted that he did have drug paraphernalia in his bedroom, Zblewski responded that "[he] was planning to take it from him." At this point, Zblewski testified that he asked for permission to enter Phillips' bedroom to collect the items.[5] Based on the proximity of the initial illegal contact with the claimed grant of consent, we conclude that

---

[5] Zblewski responded to defense counsel's questioning on cross-examination as follows:

Q But at that point [while standing outside Phillips' bedroom] you didn't ask him for permission to search further?

A At that point, no.

Q Then you entered his bedroom; is that correct?

A After he consented to it, yes.

Q Well, how could he consent to it if you never asked him?

A Okay. I had asked him if we could retrieve the items. He stated why. I told him it was a violation of the law. At that point I believe he did open the door and walk inside. We followed him in and he did retrieve the marijuana for us and then he pointed out numerous items of drug paraphernalia to us.

Q Okay. So he walked into the bedroom and you assumed that was permission for you to walk into the bedroom; is that correct?

A Correct.

this factor is not sufficiently attenuated to purge the taint of the warrantless entry. *See Anderson,* 165 Wis. 2d at 448, 477 N.W.2d at 281.

In examining the next factor of the attenuation analysis, we look to any intervening circumstances between the initial misconduct and Phillips' consent to search. In applying this factor, the *Anderson* court determined that the fact that the defendant was given *Miranda* warnings and had signed a waiver of constitutional rights prior to his statement "weigh[ed] in favor of finding that the statement and resultant search were voluntary and sufficiently attenuated from the illegal searches." *See Anderson,* 165 Wis. 2d at 448, 477 N.W.2d at 281.

However, recognizing that the presence of *Miranda* warnings alone will not purge a statement of the taint of an earlier illegality, *see Anderson,* 165 Wis. 2d at 448, 477 N.W.2d at 281, the *Anderson* court went on to consider the impact of certain intervening factors, *see id.* at 450-51, 477 N.W.2d at 282. The defendant in that case had been informed by his wife that the police had conducted two prior searches the previous day. *See id.* at 451, 477 N.W.2d at 282. The court there noted that this knowledge prevented the defendant from being "improperly surprised, frightened, or confused" when he was confronted with the seized goods by the police. *See id.*

In the instant case, there was a complete absence of intervening circumstances due to the temporal proximity of the agents' illegal entry into the basement and the search of the bedroom. Phillips was never given *Miranda* warnings, placed under arrest or handcuffed. Unlike the defendant in *Anderson,* Phillips did not have any prior knowledge that he might be the target

of a police investigation. Under these facts, we conclude that Phillips was "improperly surprised, frightened, or confused" by the agents' entry into the basement. *See Anderson,* 165 Wis. 2d at 451, 477 N.W.2d at 282. Therefore, the State cannot rely on the presence of intervening factors to purge the taint of the warrantless entry.

The third factor of our analysis requires us to consider the purpose and flagrancy of the official misconduct. *See id.* at 448, 477 N.W.2d at 281. The trial court found that the flagrancy of the official misconduct was minimal. We do not agree.

" '[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Douglas,* 123 Wis. 2d at 17, 365 N.W.2d at 582 (quoting *United States v. United States Dist. Court,* 407 U.S. 297, 313 (1972)). " 'At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Payton v. New York,* 445 U.S. 573, 589-90 (1980) (quoted source omitted). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

This court has applied the protections of the Fourth Amendment in concluding that an officer's step into the threshold of a doorway, in order to prevent the door from closing, constituted an entry. *See Johnson,* 177 Wis. 2d at 232, 501 N.W.2d at 879. We concluded there that even such a slight incursion "fixed the 'first footing' against which the United States and Wisconsin Supreme Courts warned." *See id.* In language that is still direct and appropriate, the Wisconsin Supreme Court has recognized:

> It may be that it is the obnoxious thing in its mildest
> and least repulsive form; but illegitimate and
> unconstitutional practices get their first footing in
> that way, namely, by silent approaches and slight
> deviations from legal modes of procedure. This can
> only be obviated by adhering to the rule that consti-
> tutional provisions for the security of person and
> property should be liberally construed.

*Douglas,* 123 Wis. 2d at 21, 365 N.W.2d at 584 (quoting
*Boyd v. United States,* 116 U.S. 616, 635 (1886)).

In the instant case, the illegality of both the entry
into the basement and the means of obtaining entry
into the bedroom had a "quality of purposefulness." *See
Brown,* 422 U.S. at 605. The impropriety of the initial
entry of the basement was recognized by the trial court
and conceded by the State. The agents acknowledged
that the purpose of the stop at Phillips' residence was
to investigate, in the hope that something might turn
up. *See id.* The initial illegal entry was, at the very
least, acquiesced to by three agents. Once inside the
basement, all three agents followed Phillips into his
bedroom without seeking his permission to do so, but
rather assuming consent. We conclude that applying
the third factor of the attenuation analysis—the fla-
grancy of the official misconduct—the illegality of the
agents' actions during the investigation at Phillips'
home cannot be overlooked.[6]

---

[6] The State argues that "the mere presence of police in Phil-
lips' residence is not coercive." The State then cites to other
situations where courts have found voluntary consent, arguing
that the following were more coercive settings: questioning a
suspect while he sat in a squad car, *see United States v. Baker,*
78 F.3d 1241 (7th Cir. 1996), and questioning a suspect at the
police station, *see State v. Xiong,* 178 Wis. 2d 525, 504 N.W.2d

The State responds that *State v. Kraimer,* 91 Wis. 2d 418, 283 N.W.2d 438 (Ct. App. 1979), *aff'd,* 99 Wis. 2d 306, 298 N.W.2d 568 (1980), is factually similar and offers that "courts have repeatedly found that an illegal entry or an illegal arrest did not require suppression of evidence acquired after the illegality." *Kraimer,* however, is distinguishable.

In *Kraimer*, police received several telephone calls from an unidentified man who said he had killed his wife four days earlier. Using information from the caller and other sources, police developed three possible locations and officers were sent to investigate. One location was Kraimer's home; when an officer knocked on the door, there was no response. However, when the officer went to the back door of the home, he observed that one pane of glass was missing in the door. After another officer arrived, entry was gained by reaching through the missing pane to turn the doorknob. *See id.* at 424, 283 N.W.2d at 441.

Once the officers were in the home, they again announced their presence, but got no response. They proceeded up the stairs, and before reaching the second floor heard footsteps coming from the first floor. They then saw Kraimer, who told the officers he was "glad it's over." *See id.* Kraimer responded affirmatively to the officers' questions about whether he had made the calls. Kraimer then told the officers that his wife was upstairs in the bedroom and also led them to where he had hidden the murder weapon. *See id.* at 424-25, 283 N.W.2d at 441.

---

428 (Ct. App. 1993). The State then posits that because Phillips was in his own home, any taint of coercion is removed. This reasoning, however, ignores long-standing precedent which places the protection of the Fourth Amendment at the threshold of the home.

We concluded in that case that despite the fact that Kraimer's statements were made contemporaneously with his seeing the officers in his home, and that there were no intervening circumstances, "Kraimer never objected or acted annoyed that the officers were in his home. In fact, he acted relieved." *See id.* at 434, 283 N.W.2d at 446. We also noted that the statements were "made by a man eager to unburden his soul." *Id.* at 435, 283 N.W.2d at 446. "At no time did the police in any way take advantage of their illegal entry or exploit their presence in the Kraimer home . . . . Everything was volunteered by Kraimer." *Id.*

We are not persuaded that the facts of the instant case are similar to those which the court looked to in *Kraimer.* The warrantless entry into the Kraimer home was based upon an attempt to investigate an unusual and unsettling claim which the police had anonymously received. At the time of the entry, the police were investigating several possible locations; suspicion was not centered on any individual. Furthermore, Kraimer's initial statement was volunteered to the officers. We are persuaded that the *Kraimer* decision was premised on the unique investigative situation it presented, based as it was on information provided by an anonymous caller. We decline to apply that reasoning to the facts of the instant case.

In sum, we are compelled to reverse the judgment based upon our analysis that the attenuation theory fails to purge the taint from the warrantless entry into the basement. We conclude that the combination of the temporal proximity of the illegal entry, the lack of any intervening circumstances and the flagrancy of the agents' misconduct warrants the application of the exclusionary rule. Along with the factors outlined

above, we must consider whether "deterring unlawful police conduct and protecting the integrity of the judicial system" are served by exclusion. *See Anderson,* 165 Wis. 2d at 456-57, 477 N.W.2d at 285 (Heffernan, C.J., dissenting). Exclusion of the evidence obtained against Phillips will serve to underscore the importance of the threshold of the home and the need for police to obtain a search warrant or voluntary consent before crossing it.[7] We therefore reverse the judgment of conviction and remand with directions to vacate the same.

*By the Court.*—Judgment reversed and cause remanded with directions.

---

[7] We also note that although the agents were responding to information they received from a confidential informant, the reliability and credibility of that informant was never tested, given the fact that the police did not obtain a search warrant. *See Ritacca v. Kenosha County Court,* 91 Wis. 2d 72, 79, 280 N.W.2d 751, 755 (1979) (a warrant based solely on hearsay information must include the underlying circumstances which show reason to believe the informant is credible and reliable).