STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Scott C. ANDERSON, Defendant-Appellant.

Supreme Court

*No. 90-0125. Oral Argument October 4, 1991.—Decided December 11, 1991.*

(Also reported in 477 N.W.2d 277.)

For the plaintiff-respondent-petitioner there was a oral argument by *Maureen McGlynn Flanagan,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

For the defendant-appellant there were briefs (in the Court of Appeals) by *Terry W. Rose* and *Rose & Rose,* Kenosha and oral argument by *Terry W. Rose.*

LOUIS J. CECI, J. This case is before the court on petition for review of a published decision of the court of appeals, *State v. Anderson,* 160 Wis. 2d 307, 466 N.W.2d 201 (Ct. App. 1991). The court of appeals reversed a judgment of conviction entered by the circuit court for Kenosha County, Bruce E. Schroeder, Circuit Judge. Following a jury trial, the defendant was con-

victed of two counts of burglary. He was sentenced to an indeterminate term of not more than two years in the Wisconsin State Prison on count one and to a consecutive term of not more than four years on count two. Execution of the sentence on count two was stayed pending successful completion of four years' probation, to run consecutively to the prison term imposed in count one.

The court of appeals reversed the conviction on the grounds that the evidence obtained from the defendant's statement and consent to search his garage was tainted by two prior warrantless searches. Because we find the statement and resulting search sufficiently attenuated from the two prior searches, we reverse the decision of the court of appeals.

The facts of this case follow. During February 3–6, 1989, a series of burglaries took place at a storage warehouse in Kenosha, Wisconsin. While investigating on the morning of February 6, 1989, the police noticed fresh footprints in the snow and other tracks which led from the door of the warehouse to a location close to where the defendant lived. The investigating officer decided to question the residents in the area to ascertain if they had noticed anything peculiar the night before. While knocking on the defendant's neighbor's door, the officer noticed a shopping cart in the defendant's backyard. Thinking that the tracks leading from the warehouse could have been made by a shopping cart, the officer took the owner of the warehouse to the neighbor's driveway. Viewing the shopping cart from the neighbor's driveway, the owner identified the cart as one of the stolen items.

Between 2:00 and 3:00 p.m. that same day, two detectives knocked on the defendant's door. The defendant's 15-year-old daughter answered the door and said

she was the only one home. The detectives told the girl that there had been some burglaries in the neighborhood and that the cart appeared to be one of the stolen items. They asked her if she wanted them to check her garage to see if anything was missing. She assented and accompanied the detectives to the garage. Upon entering the garage, the detectives noticed many items that matched the description of the property missing from the warehouse. The warehouse owner also identified many items in the garage as those that had been stolen. None of the items were seized at that time.

One of the detectives stayed to observe the defendant's home from a police car while the other returned to the police station to obtain a search warrant. At the station, the detective filled out a form entitled "Affidavit For Search Warrant." He took the form to an assistant district attorney who reviewed it and filled out more forms. The detective then signed the affidavit and swore to it in the presence of a circuit court judge, who acknowledged the officer's oath. The record does not contain an actual search warrant, and the circuit court did not find that a warrant was issued.

The detective returned to the defendant's home, where he and his partner attempted to gain access to search the home. No one answered the door, so the detectives waited until the defendant's wife came home between 5:00 and 5:30 p.m. The defendant's wife refused to let the detectives search the home or garage unless her husband assented or unless the police executed a search warrant. The defendant's wife telephoned the defendant at a tavern, and he told her he would be home soon. When the defendant telephoned from a second tavern, the defendant's wife led police to that tavern to look for the defendant, but he was no longer there. The police returned to the defendant's home and executed what

444

they claimed to be a search warrant, but which was actually the previously mentioned affidavit for a search warrant. The police searched the defendant's home and garage and seized the items that they believed belonged to the warehouse owner.

The defendant later testified that he returned home at 1:00 a.m. His wife informed him of the two searches the police had conducted and of the items the police had seized.

The next morning, the detectives went to the defendant's home to arrest him on an outstanding traffic warrant and to question him about the burglaries. They awoke the defendant at 7:30 a.m., and he stated that he had intended to telephone the police when he awoke. While transporting the defendant to the police station, the detectives and the defendant had some humorous conversation about one of the detectives dipping his tie into a bucket of oil in the defendant's garage the previous day. The defendant testified that the joke during the ride was that "I owe him a tie."

At the police station the defendant received *Miranda* warnings *(see Miranda v. Arizona,* 384 U.S. 436 (1966)) and signed a waiver of constitutional rights form. At 8:15 a.m.; the defendant began to give his statement in which he admitted having taken the items from the storage warehouse. After being shown the items that the detectives had seized during the second search, the defendant volunteered that there were more items in the garage that had come from the warehouse that the police had missed. The defendant signed a consent to search and seize form and returned to his home with the detectives for a third search of his garage. During the third search, the police seized the remaining items which the defendant had admitted taking from the warehouse.

At the conclusion of the third search, the defendant returned to the police station with the detectives. The defendant's statement was typed, and he signed it.

Prior to trial the circuit court conducted a suppression hearing to determine if the searches and evidence seized during the searches were admissible. The defendant's wife and 15-year-old daughter both testified that the daughter could not have friends over or let anyone into the house without her parents' permission. The circuit court ruled that the first search was invalid as the defendant's daughter did not have common authority over the premises and therefore could not legally give consent to search the garage. The circuit court ruled that the second search and the evidence seized in that search were invalid because the police did not have a search warrant and because the affidavit for the warrant was based on information obtained during the first illegal search. The first two searches and evidence obtained during those searches were therefore excluded.

The circuit court ruled that the third search and the evidence seized during the third search were admissible, as the shopping cart in the defendant's backyard would have led to a continuing police investigation even in the absence of the two illegal searches. The circuit court also reasoned that the defendant had failed to demonstrate any police exploitation of the two prior searches. The third search and the defendant's statement were, therefore, sufficiently attenuated from the two illegal searches. Following a jury trial, the circuit court entered a finding of guilty on both counts of burglary, in violation of sec. 943.10(1)(a), Stats.

The court of appeals reversed the conviction on the grounds that the third search was the product of the two prior illegal searches. The court of appeals' opinion concluded that the defendant's "confession and consent

were the products of the fourth amendment violation because Anderson would not have confessed or consented to the third search of his garage if the police had not already searched his garage twice without a warrant." *Anderson,* 160 Wis. 2d. at 323. The court of appeals rejected the attenuation analysis performed by the circuit court. The state petitioned for review.

The defendant argues that the first two searches of his home were contrary to the Fourth Amendment of the United States Constitution. He also argues that his statement and the third search of the home were obtained by police exploitation of the two previous searches. He concludes that because the statement and evidence obtained during the third search were fruits of the two prior illegal searches, they should have been suppressed.

■

Whether evidence should be suppressed because it was obtained pursuant to a fourth amendment violation is a question of constitutional fact. We independently review constitutional fact questions. *State v. Woods,* 117 Wis. 2d 701, 715-16, 345 N.W.2d 457 (1984), *habeas corpus granted sub nom. Woods v. Clusen,* 605 F. Supp. 890 (E.D. Wis. 1985), *aff'd* 794 F.2d 293 (7th Cir. 1986).

The court of appeals' opinion did not apply the attenuation analysis found in *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975). We discussed *Brown* in *State v. Walker,* 154 Wis. 2d 158, 186-87, 453 N.W.2d 127 (1990), and reversed and remanded with directions to the circuit court to apply the factors set forth in *Brown.* Today we reaffirm that the *Brown* analysis is the proper test to follow in attenuation cases.

The primary concern in attenuation cases is whether the evidence objected to was obtained by exploitation of a prior police illegality or instead by

means sufficiently attenuated so as to be purged of the taint. *Walker,* 154 Wis. 2d at 186; *Wong Sun v. United States,* 371 U.S. 471, 488 (1963). In this case, if the defendant's statement and consent to search were obtained by exploitation of the two prior illegal searches,[1] then the statement and evidence obtained during the third search should have been excluded. If, however, the statement and resultant third search were obtained by means sufficiently distinguishable from the prior searches, then they were properly admitted into evidence by the circuit court, and the conviction must stand.

The defendant was given *Miranda* warnings and signed a waiver of constitutional rights form prior to his statement. These facts weigh in favor of finding that the statement and resultant search were voluntary and sufficiently attenuated from the illegal searches. However, the presence of *Miranda* warnings alone does not cause the statement to be sufficiently attenuated so as to purge it of the taint of the illegal action. *Brown,* 422 U.S. at 603. There are other factors that must be considered in determining the question of attenuation. These are the temporal proximity of the official misconduct and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id.* at 603–04.

---

[1] The circuit court decided that the prior searches were in violation of the defendant's fourth amendment rights. Although we refer to the two prior searches as having been illegal, we do so only for discussion purposes and do not decide that issue today. We will, however, examine the flagrancy of the police misconduct during the first two searches later in this opinion as part of our analysis of the factors set forth in *Brown.*

Under the temporal proximity factor, we analyze both the amount of time between the prior searches and the conditions that existed during that time. *See Rawlings v. Kentucky,* 448 U.S. 98, 107–08 (1980); *United States v. Fazio,* 914 F.2d 950, 957–58 (7th Cir. 1990). In *Rawlings,* the Court found an admission of drug ownership after a 45-minute illegal detention sufficiently attenuated so as not to require exclusion. The Court noted that under the strictest of custodial conditions, the 45-minute time span might not be long enough to purge the initial taint. *Rawlings,* 448 U.S. at 107. However, the Court found that the nonthreatening, congenial conditions that existed during the detention outweighed the relatively short period of time between the initiation of the detention and the admission. *Id.* at 108.

In *Brown,* the time span was little more than one hour between the defendant's illegal arrest and his incriminating statement. During that time, in which the defendant was transported to the police station and put into an interrogation room, there was "no intervening event of significance whatsoever." *Brown,* 422 U.S. at 604. The Court held the defendant's statement not sufficiently attenuated to be admissible.

In *Wong Sun,* the police were led to defendant Wong Sun by statements from defendant Toy and by statements and contraband taken from a person named Yee. Wong Sun was arraigned and released on his own recognizance. Wong Sun voluntarily returned several days later and made a confession. The Court found that the contraband taken from Yee and the statements by Yee and Toy were not admissible as they were obtained in violation of the fourth amendment. However, the connection between the confession by Wong Sun and the illegally obtained contraband and declarations was held

to be "so attenuated as to dissipate the taint." *Wong Sun,* 371 U.S. at 491 (citation omitted).

In *Fazio,* the length of time between the illegal search of the defendant's restaurant and his subsequent incriminating statement to the police was about an hour. *Fazio,* 914 F.2d at 957. During that time the defendant was not under custody, and he drove his own vehicle to the police station to make the statement. After examining all the *Brown* factors, the *Fazio* court concluded that the defendant's statement was sufficiently attenuated to render it admissible.

Here, the length of time between the illegal searches and the defendant's statement to the police is not clear, although it was overnight and at least seven hours. During that time, the defendant was at some taverns in Kenosha until he returned home at approximately 1:00 a.m. At 7:30 a.m. the police returned to the defendant's residence, awoke him, and then arrested him on an outstanding warrant for a traffic violation. The defendant testified that he took part in some humorous conversation with the detectives during the ride to the station, as one of the detectives had dipped his tie into a bucket of oil in the defendant's garage the previous day. After being transported to the police station, the defendant gave his statement at 8:15 a.m. Given the length of time and the nonthreatening conditions that existed between the illegal searches and the defendant's statement, we find that the temporal proximity factor of the *Brown* analysis leans toward a finding of attenuation.

The second factor of the *Brown* analysis—the presence of intervening factors—also leads us to find that the statement was sufficiently attenuated from the illegal searches. The defendant's statement and consent to search were given after he had received proper *Miranda* warnings and signed a waiver of constitutional rights

450

form. The defendant certainly understood his rights and voluntarily waived them.

In addition, his wife had fully informed him of the searches that had taken place the prior day. While that knowledge may have led him to believe that he should cooperate with the police, we do not find, as the court of appeals did, that this knowledge "aggravates rather than removes the taint." *Anderson,* 160 Wis. 2d at 322. To the contrary, that knowledge illustrates that the defendant was not improperly surprised, frightened, or confused when he was confronted with the seized goods. *Compare Brown,* where the arrest was effected in a manner "calculated to cause surprise, fright, and confusion." *Brown,* 422 U.S. at 605.

The defendant testified at the suppression hearing that he signed the consent because he "realized from seeing the items that there were other items they hadn't taken that were still in my garage." That admission that there were other stolen items in his garage was an "independent act of a free will," *Wong Sun,* 371 U.S. at 486, as he was under no obligation to reveal the existence of those other items, and the police had no knowledge that there was more evidence that they had not seized.

The defendant's free will and voluntary cooperation is further illustrated by his statement that he planned to contact the police when he awoke that morning. All of these intervening circumstances indicate that the defendant's statement and consent to search were "act[s] of free will [sufficient] to purge the primary taint of the unlawful invasion." *Id.*

Finally, "the conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion" of the defendant's statement and consent. *Rawlings,* 448 U.S. at 110. Prior to the first search, the police obtained consent from the defendant's

15-year-old daughter. Although the daughter and the defendant's wife both later testified that the daughter did not have authority to let people into the house or garage without permission, we do not conclude that the detectives' reliance upon a 15-year-old daughter's permission to search was so improper as to be labeled conscious or flagrant misconduct that would lead us to exclude the defendant's statement and evidence gained by the third search.

After the first search, one detective stayed at the defendant's home while the other detective returned to the police station to obtain a search warrant. At the station, the detective filled out the "Affidavit For Search Warrant" form. He took the form and had it reviewed by an assistant district attorney. The detective swore to the affidavit before a circuit court judge, who acknowledged the officer's oath. Although there is no record of an actual search warrant ever being issued in this case, the police made a substantial attempt to conform to the requirements of the fourth amendment. While the absence of a search warrant is a serious defect, when we consider that an assistant district attorney reviewed the affidavit and participated in obtaining the judge's signature, we conclude that it was neither purposeful nor flagrant misconduct by the police detectives that would lead us to exclude the defendant's statement and evidence gained by the third search.

The defendant did not submit a brief before this court, but only submitted a letter stating that his position was set forth in the briefs that he submitted to the court of appeals. In his court of appeals' brief, the defendant argued that the circuit court erred in not granting a mistrial based upon error committed by the court during

voir dire. While the court of appeals' opinion did not reach that issue, we do reach the issue and determine that the trial court properly denied the defendant's motion for a mistrial.

At trial, the defendant moved for a mistrial on the grounds that the court, during voir dire, improperly mentioned suppressed evidence. During voir dire, the court stated:

> The Complaint charges that on February 3rd, . . . [the] storage building had been entered. [The owner] had detected that . . . certain items of machinery were gone from the storage area. And it is further alleged in the Complaint that those items were subsequently found at the residence of the defendant in his garage; and that a shopping cart which had been used to transport those materials from the storage place to the garage was outside the garage.

As the defendant's statement and the items seized during the third search fit the above summary given by the circuit court during voir dire, we agree with the circuit court that the motion was properly denied.

*By the Court.*—The decision of the court of appeals is reversed.

HEFFERNAN, CHIEF JUSTICE *(dissenting)*. Because the illegal actions of the Kenosha police detectives in this case were both purposeful and flagrant, the evidence obtained from Anderson's statement and consent to a third search of his garage should have been excluded. Accordingly, I dissent.

The question in this case is whether the disputed evidence was obtained by exploitation of the illegal searches or by means sufficiently distinguishable to be purged of the primary taint. In *Brown v. Illinois,* 422

U.S. 590 (1975), the U.S. Supreme Court set forth three factors relevant to such an inquiry:

> the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, *particularly,* the purpose and flagrancy of the official misconduct . . ..

*Id.* at 603–04 (citations omitted) (emphasis added). In this case, as in *Brown,* "[t]he illegality [of the police misconduct] had a quality of purposefulness." *Id.* at 605.

The first illegal search was based upon the "consent" of the Andersons' 15-year-old daughter. The majority concluded without analysis that the detectives' reliance on that "consent" was not "so improper as to be labeled conscious or flagrant misconduct that would lead us to exclude the defendant's statement and evidence gained by the third search." Majority op. at 452. The majority ignores the fact that the detectives obtained the "consent" through a ruse in the first place: they asked the girl whether they could search the garage to determine whether anything of the Andersons' had been stolen.

The notion of "consent through chicanery" or "consent through deception" is unsettling. As one court noted, "[a] ruse entry, by its very nature, runs contra to the concept of an intelligent consent or waiver." *United States v. Phillips,* 497 F.2d 1131, 1135 n.4 (9th Cir. 1974). Of course, the concept of "consent" in the fourth amendment context is different than the concept of waiver. While in certain circumstances police may be justified in using deceptive tactics to obtain consent to a search, *see* 3 Wayne R. LeFave, *Search and Seizure,* sec. 8.2(n), at 228–35 (1987), deceitfully obtaining third party consent from a child is surely not among them.

The fourth amendment generally prohibits the warrantless entry of a person's home to search for specific objects. *Illinois v. Rodriguez,* 110 S. Ct. 2793, 2797 (1990). However, warrantless searches have been held to be reasonable in situations where voluntary consent has been obtained from either the individual whose property is searched or from a third party with common authority over the premises. *Id.* In *Schneckloth v. Bustamonte,* 412 U.S. 218, 248 (1975), the U.S. Supreme Court stated: "[T]he Fourth and Fourteenth Amendments require that [the State] demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." The ruse perpetrated upon Anderson's 15-year-old daughter smacks of implied coercion, not of voluntariness. Moreover, the record is clear that this child did not have authority over the premises common with the defendant or his spouse.

The focus when reviewing a warrantless search is on the "reasonableness" of the search. *Rodriguez,* 110 S. Ct. at 2800. I find a warrantless search of an individual's property based upon "consent" obtained by tricking a 15-year-old child to be unreasonable. The fact that the detectives did not seize anything at that time, but instead began their ill-fated attempt to obtain a search warrant, indicates their awareness that the search was illegal, and indicates the purposeful nature of their conduct.

The second illegal search was conducted pursuant to a faulty "warrant" which the detectives served upon Mrs. Anderson. The warrant was actually one detective's affidavit. Regarding the second search, the majority concludes:

> Although there is no record of an actual search warrant ever being issued in this case, the police made a substantial attempt to conform to the requirements

of the fourth amendment. While the absence of a search warrant is a serious defect, when we consider that an assistant district attorney reviewed the affidavit and participated in obtaining the judge's signature, we conclude that it was neither purposeful nor flagrant misconduct by the police detectives that would lead us to exclude the defendant's statement and evidence gained by the third search.

Majority op. at 452.

Regardless of the "substantial" efforts of the police to obtain a warrant, they did not obtain one. Police officers and detectives must be held to know the difference between an affidavit attesting their belief that probable cause for a search exists, and a search warrant, which is a judicial determination that the facts alleged are sufficient to spell out probable cause for the search. The detectives' attempt to obtain consent from Mrs. Anderson, and their dogged efforts to track down Anderson before they executed the affidavit, evince the fact that they knew they did not have a judicially-issued warrant. As was said in *Brown,* the course of conduct in this respect had a "quality of purposefulness" that demonstrated knowledge that the document was not a judicial warrant. Yet the detectives falsely informed Mrs. Anderson that they had a search warrant, and searched the Andersons' home and garage. This is misconduct both purposeful and flagrant.

Regardless of the temporal proximity of the illegal searches and Anderson's statement and consent to a third search, and any intervening circumstances, the flagrancy of the police misconduct in perpetrating the initial illegal searches warrants application of the exclusionary rule. Along with the factors of *Brown,* the court must consider whether the purposes of the exclusionary rule—deterring unlawful police conduct and protecting

the integrity of the judicial system—are served by exclusion. *Brown,* 422 U.S. at 599–600. Exclusion of all of the evidence obtained in this case will serve to deter future police misconduct. The obverse is also true: the majority's failure to exclude the evidence in this case may encourage police misconduct, perpetrated in the hope of obtaining a subsequent confession. *See New York v. Harris,* 495 U.S. 14, 110 S. Ct. 1640, 1650–51 (1990) (Marshall, J., dissenting).

The "oily tie" joke in the police car, along with the *Miranda* warnings, do not support the majority's conclusion that the police did not exploit the illegal searches. The record in this case is silent as to the exact manner and time that Anderson was confronted with the seized stolen items. One inference which may be drawn from the record, including what the majority concludes to be the non-threatening circumstances revealed by the "oily tie" conversation, is that Anderson cooperated with a false expectation of leniency. The use of illegally obtained evidence combined with subtle suggestions of leniency to evoke a confession constitutes "exploitation" of an unconstitutional search. Because the state failed to prove that the police did not exploit the illegal searches, I conclude that Anderson's statement and evidence gained by the third search were tainted and should have been excluded.

I respectfully dissent and would affirm the carefully reasoned decision of the court of appeals. I am authorized to state that Justice Shirley S. Abrahamson joins this dissenting opinion.