STATE of Wisconsin, Plaintiff-Respondent,†

v.

Bradley J. VORBURGER, Defendant-Appellant.

Court of Appeals

No. 00–0971–CR. *Submitted on briefs December 13, 2000.—Decided January 25, 2001.*

2001 WI App 43

(Also reported in 624 N.W.2d 398.)

†Petition to review granted.

482

On behalf of the defendant-appellant, the cause was submitted on the briefs of *David D. Cook* of *Law Office of David D. Cook*, Monroe.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Shunette T. Campbell*, assistant attorney general.

Before Dykman, P.J., Vergeront and Deininger, JJ.

¶ 1. DYKMAN, P.J. Bradley J. Vorburger appeals from a judgment convicting him of possession of cocaine with intent to deliver. The trial court denied his motion to suppress evidence found after he consented to a search of his car, and after Amerie Becker, his codefendant at trial, consented to a search of their

485

apartment. Vorburger argues that evidence police obtained pursuant to the consent searches should have been suppressed because he and Becker gave consent under conditions constituting an arrest where the police lacked probable cause justifying that arrest. The State argues that the consents were valid because Vorburger and Becker were not under arrest but subject only to a temporary investigative detention. The State also argues that even if Vorburger and Becker were subject to an unlawful arrest, their consents were nevertheless sufficiently attenuated from the arrest. We conclude that, given all the facts, Vorburger and Becker were subject to an unlawful arrest. We further conclude that their consent to search was not attenuated from the unlawful arrest. We therefore reverse.

## I. Background

¶ 2.   On July 2, 1997, an employee at a Madison area motel entered one of the rooms to determine whether it had been cleaned. He noticed a strong smell that made him suspicious and saw a bag containing what he thought was marijuana. He took a sample from the bag to the front desk. He or another motel employee called the police. Officers were dispatched to the motel and after looking at motel records, determined that the room was rented by Cory Cramer. The records also showed a vehicle license plate number associated with the motel room. Police checked on the plate number and found the vehicle was registered to Peter Kokoros. The police initiated procedures to obtain a search warrant.

¶ 3.   Lieutenant Randall Gaber arrived at the motel, and learned that another vehicle was associated with Cramer. About six armed police officers, including Gaber, entered another motel room to stake out the one

rented to Cramer. At approximately 9:20 p.m., the police saw Vorburger, Becker, and Cramer walking down the motel hallway toward Cramer's room. Cramer was holding the key.

¶ 4. The police exited the stake-out room, announcing their presence in loud voices, and directed Vorburger, Becker, and Cramer to stay where they were. Lieutenant Gaber told Cramer to put his hands on the wall, and Cramer was eventually handcuffed. Officer Linda Kosovac told Vorburger to put his hands behind his back and handcuffed him with the assistance of a deputy sheriff. Another officer handcuffed Becker's hands behind her back. The police told Vorburger, Cramer, and Becker that they were not under arrest but were being detained for further investigation. Between five and eight officers were present in the motel hallway when Vorburger, Becker, and Cramer were first detained, and a total of about eleven officers were working on the investigation.

¶ 5. At about 9:40, Becker indicated that she had to use the restroom. When Officer Kosovac said she would have to accompany her, Becker changed her mind. Becker testified that she had just undergone a D&C, was experiencing post-surgical bleeding, and did not want someone else lowering her pants for her.

¶ 6. Detective Alix Olson arrived at the motel with the search warrant at approximately 10:05. She testified that she observed Cramer, Vorburger, and Becker, still detained in the hallway. Olson took Cramer into a nearby room, showed him the search warrant, and read it to him. At approximately 10:15, several officers, including Olson, entered Cramer's room to execute the warrant. Olson detected an overpowering marijuana smell in the room, which

contained a large amount of marijuana and a digital scale.

¶ 7.    Shortly after 10:30, Officer Kosovac took Becker into another room and removed her handcuffs. The door to the room was left ajar about two or three inches. After Becker used the restroom with the door to it open, Kosovac read Becker *Miranda* warnings. Kosovac explained to Becker that the police were conducting a drug investigation and began asking her questions. Becker stated that she leased an apartment, where she lived with Vorburger. Kosovac asked whether Becker had any controlled substances, and Becker said that she did not. Becker told Kosovac she could search her purse, and emptied it out. Becker then explained that all she had was a small amount of marijuana at her apartment. Kosovac told Becker that she wanted to confiscate the marijuana from Becker's apartment, and asked her if the police could search it. Becker consented to the search.

¶ 8.    Meanwhile, the police detained Vorburger in the hallway. Detective Olson read Vorburger *Miranda* warnings at 11:00, and then asked him some questions. Olson did not indicate to Vorburger whether he was free to leave. At 11:06, she asked him if the police could search his car, and he said they could. Vorburger's car was a third vehicle on the scene in addition to Cramer's and Kokoro's vehicles. When police searched Vorburger's car, they found a "blunt"[1] and another small amount of marijuana. Gaber testified that Vorburger remained handcuffed until about 11:45 or midnight.

---

[1] A "blunt" is a "cigar used to smoke marijuana by hollowing out the center and inserting the drug." *State v. Hughes*, 2000 WI 24, ¶ 8, 233 Wis. 2d 280, 607 N.W.2d 621.

¶ 9.  Kosovac and two other officers went to Becker's apartment and searched it with Becker present. They found marijuana, powder cocaine, hallucinogenic mushrooms, more blunts, a postal scale, and about $2,000 in cash. Becker was the sole leaseholder of the apartment, but Vorburger had been living with her since the time she moved in.

¶ 10.  Based in part on the contraband from Vorburger's car and Becker's apartment, the State charged Vorburger with several crimes. Vorburger moved to suppress the evidence obtained against him, including the drugs obtained from the search of his vehicle and Becker's apartment. The trial court denied the motion. Vorburger pleaded no contest to possession of cocaine with intent to deliver, party to a crime, in violation of WIS. STAT. §§ 961.41(1m)(cm)2 and 939.05 (1995–96). The trial court entered a judgment of conviction, and Vorburger appeals.

## II.  Analysis

### A.  Unlawful Arrest

■■■

¶ 11.  Both an arrest and a *Terry* investigative stop are seizures under the Fourth Amendment. *Laasch v. State*, 84 Wis. 2d 587, 595, 267 N.W.2d 278 (1978) (arrest); *State v. Taylor*, 226 Wis. 2d 490, 494, 595 N.W.2d 56 (Ct. App. 1999) (stop). Police may stop an individual and conduct a limited investigation without probable cause to arrest. *Taylor*, 226 Wis. 2d at 494. However, police may not seek to verify their suspicions by means that approach the conditions of arrest. *Florida v. Royer*, 460 U.S. 491, 499 (1983); *State v. Quartana*, 213 Wis. 2d 440, 448, 570 N.W.2d 618 (Ct. App. 1997). "[E]very seizure having the essential

attributes of a formal arrest[ ] is unreasonable unless it is supported by probable cause." *Michigan v. Summers*, 452 U.S. 692, 700 (1981).

¶ 12.   Vorburger argues that the police exceeded the limited scope of a *Terry* stop, and instead arrested him and Becker. He further contends that, because the police lacked probable cause, the arrest was unlawful. Therefore, he asserts, both his consent to the car search and Becker's consent to the apartment search were fruits of unlawful arrests, and the evidence the police discovered pursuant to the consent searches should have been suppressed.[2] We agree.

¶ 13.   We first address the question of whether Vorburger and Becker were subject to an arrest at the motel. The question of whether a seizure has occurred based on a given set of facts is a question of law that we review de novo. *State v. Garcia*, 195 Wis. 2d 68, 73, 535 N.W.2d 124 (Ct. App. 1995). However, we uphold the trial court's findings of fact unless they are clearly erroneous. *State v. Wilson*, 229 Wis. 2d 256, 262, 600 N.W.2d 14 (Ct. App. 1999).

¶ 14.   We determine the moment of arrest for Fourth Amendment purposes using an objective test. *State v. Swanson*, 164 Wis. 2d 437, 446, 475 N.W.2d 148 (1991). We ask whether a reasonable person in the defendant's position would have considered himself or herself to be in custody given the degree of restraint. *Id.* at 446–47. The totality of the circumstances, includ-

---

[2]Vorburger also argues that the police coerced his and Becker's consent, while the State counters that the consent was voluntary. Because we conclude that Becker and Vorburger gave consent while subject to unlawful arrests, we need not reach the question of whether their consent was also coerced.

ing what the police officers communicate by their words or actions, controls the outcome under the test. *Id.* at 447.

¶ 15.  In *Royer*, the United States Supreme Court addressed circumstances that it concluded transformed a *Terry* stop into an arrest. *Royer*, 460 U.S. at 501–03. The defendant, Royer, was stopped in an airport after two narcotics detectives determined that he fit a drug courier profile. *Id.* at 493–94. The detectives held his airline ticket, retrieved his luggage, and took him to a small room about forty feet away from the initial stop. *Id.* at 494. After fifteen minutes of questioning in the room, a consent search of his luggage revealed marijuana. *Id.* at 494–95. However, the Court concluded that Royer's consent was invalid because he was subject to an illegal detention and that "[a]s a practical matter, [he] was under arrest." *Id.* at 503, 507–08.

¶ 16.  It is useful to contrast *Royer* with *Swanson*, where our supreme court determined that a person is not subject to an arrest simply because he or she is required to perform field sobriety tests. *Swanson*, 164 Wis. 2d at 448. Noting that the defendant was not given *Miranda* warnings nor handcuffed, the supreme court in *Swanson* explained that the clear implication of a police request to perform field sobriety tests was that if the suspect passed them, she or he would then be free to leave. *Id.* We echoed this analysis in *Quartana*, concluding that even where police transported a defendant back to an accident scene before administering the field sobriety tests, he was not subject to an arrest. *Quartana*, 213 Wis. 2d at 449–50. We rested our conclusion on a determination that the defendant "had to realize that if he passed the field

sobriety test, any restraint of his liberty would be lifted and he would be free to go." *Id.* at 451.

¶ 17. As soon as Vorburger and Becker approached Cramer's room, several police officers exited a neighboring room. One of the officers testified that the police told everyone to "stay where they were." While neither Vorburger nor Becker were transported off the motel grounds, they were eventually separated. Becker's handcuffs were not removed until after she was confined to one of the motel rooms with Officer Kosovac, and she was not permitted to use a restroom in privacy. Although Vorburger was not removed to a separate room, he remained handcuffed in the hallway for over two hours. While the record does not show that the police used force against Vorburger or Becker beyond that necessary to detain and handcuff them, two officers initially apprehended and handcuffed Vorburger, and the overall ratio of police officers to suspects was approximately two or three to one.[3] Although the police never told Vorburger and Becker they were under arrest, the police told them that they were being detained.

¶ 18. Both Vorburger and Becker were read *Miranda* warnings. Becker was not handcuffed when she was given *Miranda* warnings and questioned; however, she was in a closed-off room. In light of *Royer*, it is difficult to conclude anything other than that Becker was confined and interrogated. "[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amend-

---

[3] Kokoros had been apprehended earlier at the motel, and two of the police officers involved in that evening's investigation were detaining him in their squad car when Vorburger, Becker, and Cramer arrived at the motel.

ment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway v. New York*, 442 U.S. 200, 216 (1979). While Vorburger was not confined in a closed room, he remained in handcuffs after the police read him the *Miranda* warnings and while they questioned him. The State is correct that police use of handcuffs does not by itself necessarily transform a stop into an arrest. *See Swanson*, 164 Wis. 2d at 448. However, this case involves many circumstances that are associated with a formal arrest in addition to handcuffing. Moreover, unlike the defendants in *Swanson* and *Quartana*, Vorburger and Becker had little if any indication of how long they would be detained or what they might have to do before they were free to go. We conclude that, considering all the circumstances, a reasonable person in either Vorburger's or Becker's position would have considered himself or herself in custody.

¶ 19. Because we have determined that Vorburger and Becker were subject to an arrest at the motel, we next address whether the police had probable cause to arrest Vorburger and Becker before they searched Vorburger's car and Becker's apartment. The State does not argue the police had probable cause, instead maintaining that the length and nature of the detention did not amount to an arrest. Because the State has not briefed this issue on appeal, we could consider it abandoned. *See State v. Ledger*, 175 Wis. 2d 116, 135, 499 N.W.2d 198 (Ct. App. 1993). However, we briefly address the issue of probable cause since our decision depends in part on whether the police had probable cause to arrest Vorburger and Becker. Whether a given set of facts gives rise to probable cause

is a question of law that we review de novo.[4] *State v. Watson*, 227 Wis. 2d 167, 196, 595 N.W.2d 403 (1999).

¶ 20.  Lieutenant Gaber testified that he had no information linking Vorburger to Cramer's room. Gaber also testified that he had no information about Vorburger's car, which was not associated with Cramer's room. Detective Olson testified that the police found nothing in Cramer's room linking Vorburger to the room or its contents. Olson further testified that there was no indication Becker had ever been in the room. When Vorburger, Becker, and Cramer were walking toward the room, Cramer was the one holding the key.

¶ 21.  The State argues that once the police executed the search warrant and found marijuana in Cramer's room, they possessed a reasonable basis to continue to hold Vorburger and Becker. We disagree. The police already knew there was marijuana in the room before executing the search warrant because the motel employee told them so and provided them with a sample. That is how the police obtained a search warrant in the first place. Rather than further incriminate Vorburger or Becker, the search of Cramer's room served to dispel suspicion that either Vorburger or Becker were more closely linked to the room and its contents.

¶ 22.  Because no evidence linked Vorburger or Becker to the marijuana in the room other than their presence outside the room with Cramer, we conclude that the police did not have probable cause to arrest

---

[4] The trial court did not make a probable cause determination, presumably because it concluded that Vorburger and Becker were subject only to a temporary detention rather than an arrest.

Vorburger or Becker until after receiving their consent to search and discovering the contraband in Vorburger's car and Becker's apartment. Because we have concluded that Vorburger and Becker were already subject to an arrest before that time, that arrest was unlawful.

## B. Attenuation

¶ 23. Not all evidence is "fruit of the poisonous tree" because it came to light after illegal police actions. *State v. Simmons*, 220 Wis. 2d 775, 780, 585 N.W.2d 165 (Ct. App. 1998). The State argues that Vorburger's consent to the car search and Becker's consent to the apartment search were sufficiently attenuated from the unlawful arrest. The ultimate question is whether the evidence the State seeks to admit came about from the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *Id.* at 781; *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

¶ 24. Whether evidence should be suppressed because it was obtained pursuant to a Fourth Amendment violation is a question of constitutional fact. *State v. Anderson*, 165 Wis. 2d 441, 447, 477 N.W.2d 277 (1991). We independently review questions of constitutional fact. *Id.* In determining whether evidence is sufficiently attenuated from improper police conduct, we are required to consider (1) the temporal proximity of the official misconduct and the seizure of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the misconduct. *State v. Richter*, 2000 WI 58, ¶ 45, 235 Wis. 2d 524, 612 N.W.2d 29.

¶ 25. The police conduct here was not so severe as to preclude attenuation. However, the other two attenuation factors weigh heavily in favor of Vorburger.

¶ 26. The State relies primarily on *State v. Tobias*, 196 Wis. 2d 537, 553, 538 N.W.2d 843 (Ct. App. 1995), where we held that statements that the defendant, Tobias, made while in custody were sufficiently attenuated from his unlawful arrest. After Tobias was unlawfully arrested, the police lawfully obtained incriminating evidence from his apartment independent of the arrest. *Id.* at 545, 550. When the police informed Tobias of their discovery, he confessed. *Id.* at 550–51. We considered the discovery of the evidence and the police act of confronting Tobias with the evidence to be significant intervening circumstances. *Id.*

¶ 27. The State argues that the results of the search of Cramer's room were significant, asserting that the discovery of marijuana in the room provided an intervening circumstance sufficient to attenuate Vorburger's and Becker's consents from their unlawful arrest. However, as we have already explained, the police found nothing linking Vorburger or Becker to the marijuana in the room. Therefore, there were no intervening circumstances as there were in *Tobias*.

¶ 28. When we examine the temporal proximity factor, we also consider all the conditions at the time of consent. *Richter*, 2000 WI 58 at ¶ 46. We have already explained those circumstances in detail and need not repeat them, but we have taken them into account and conclude that they weigh against the State.

¶ 29. In *Tobias*, we analyzed the temporal proximity factor by comparing the time that the unlawful

arrest commenced to the time that Tobias made his confession. *Tobias*, 196 Wis. 2d at 544–45, 549. However, we question whether that framework applies here where no intervening circumstances arose. In *Tobias*, we concluded there was sufficient attenuation "especially because the facts indicate the statements were obtained not by exploitation of the arrest, but because Tobias was confronted with untainted, incriminating evidence against him." *Id.* at 553. Because an unlawful arrest may be ongoing, there is arguably no temporal distance between an unlawful arrest and consent obtained from the individual during the course of that arrest, unless there are intervening circumstances or other developments leading to probable cause. Considering this and all the facts, we conclude that the temporal proximity factor weighs in favor of Vorburger as well, and that Vorburger's and Becker's consents were not attenuated from the unlawful arrest. On remand, the trial court is directed to grant Vorburger's motion to suppress.

*By the Court.*—Judgment reversed and cause remanded with directions.