STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert Lee ARTIC, Sr., Defendant-Appellant.†

Court of Appeals

*No. 2008AP880–CR. Submitted on briefs October 7, 2008.
—Decided December 9, 2008.*

2009 WI App 12

(Also reported in 762 N.W.2d 436.)

† Petition for review granted 2/10/09.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James D. Cooley* of the Criminal Appeals Project, Frank J. Remington Center, University of Madison Law School, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Thomas J. Balistreri*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Robert Lee Artic, Sr. appeals from a judgment entered after a jury found him guilty of one count of maintaining a drug trafficking place, contrary to WIS. STAT. § 961.42(1) (2005–06)[1] and one count of possession with intent to deliver cocaine as a party to a crime, contrary to WIS. STAT. §§ 961.41(1m)(cm)4. and 939.05. Artic claims the trial court erred in denying his suppression motion, seeks reversal of the postconviction order denying his post-conviction motion alleging ineffective assistance of trial counsel and requests that we vacate the judgment.

¶ 2. Artic raises three issues: (1) defense counsel was ineffective for failing to argue at the suppression motion hearing that the police manufactured exigent circumstances; (2) defense counsel was ineffective for failing to argue at the suppression motion hearing that the police were impermissibly within the constitutionally-protected curtilage of Artic's home when they made observations of alleged exigencies; and (3) the trial court erred in denying the defendant a *Machner*[2] hearing on the suppression motion argu-ments. All of Artic's arguments go to the lawfulness of the initial entry into the building at 3206 North 15th Street.

¶ 3. We hold that even if the entry to the building was unlawful, the subsequent search of Artic's upstairs residence was a lawful consensual search, which was sufficiently attenuated from the unlawful entry into the

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[2] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

building. Therefore, even if Artic's trial counsel's performance was deficient in failing to challenge the initial entry, Artic was not prejudiced by this failure. Accordingly, we affirm.[3]

## BACKGROUND

¶ 4. On January 29, 2006, at approximately 6:00 p.m., City of Milwaukee Police were notified by a confidential informant that a person named "Rob" would be engaged in some type of drug transaction in the 3200 block of North 15th Street on Sunday, January 29, 2006. The informant stated that Rob would go to a house on that block, retrieve the cocaine, and return to the vehicle to complete the sale. The informant also told police that Rob was a black male, approximately thirty years old, six-feet tall, who weighed about 280–300 pounds. Three undercover police vehicles were sent to the 3200 block of North 15th Street to conduct surveillance. Detective Brian Stott, Detective David Metz and the informant were in one vehicle. Officer David Lopez and Detective Mark Wagner were in a second vehicle, and Officer Michael Washington and Detective Nicole Davila were in a third vehicle. All were dressed in plain clothes, but some had police markings on their clothing.

¶ 5. At approximately 7:50 p.m., police observed a green mini-van drive up and park in front of the residence at 3214 North 15th Street. A black male, fitting the description of Rob, exited the vehicle and entered the residence at 3206 North 15th Street. After a brief time inside the residence (less than five min-

---

[3] We will not address Artic's "manufactured exigencies" argument as it does not affect our decision. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need to be addressed).

utes), Rob was seen leaving the residence. Immediately after Rob entered the mini-van, police approached the van. They saw two clear plastic bags, containing a white powdery substance on the floor to the right of the driver's seat. The substance was believed to be cocaine. It was subsequently tested and confirmed to be cocaine. The two bags together weighed a total of 4.67 ounces.

¶ 6. Rob, whose full name is Robert Lee Artic, Jr. (Artic, Sr.'s son), was arrested for possession of cocaine with intent to deliver. Lopez testified that Rob cooperated with police. The police testified at the suppression hearing that after arresting Rob, they cleared the scene to avoid alerting the neighborhood to their presence. Stott testified that the plan was to "secure the residence in a discreet manner, obtain a search warrant and talk to Robert Artic Jr., in a different location so no one would know the police were on the block." Stott indicated that he was going to verify with Rob that no one was in the residence, and then obtain a search warrant for the residence. As Stott was seated in the squad car with Rob waiting for a van to take him downtown, Wagner and Metz went up to the door to verify that no one else was inside. Wagner testified that they went to the house, "To conduct — to contain the residence and secure it at that point to see if anybody lived at the residence and if need be, apply for a warrant."

¶ 7. Wagner and Lopez went to the front, downstairs door of the building. Wagner knocked first, and when there was no answer, he knocked and announced "Milwaukee Police" multiple times. The police observed a video camera in the front porch area, which they learned later was connected to a monitor on the second floor. The video camera allowed the second-floor resident to see who was at the front door of the residence.

139

¶ 8. Davila went to the rear, southeast corner of the residence. Her responsibility was to make sure no one escaped out the back of the residence. Upon approaching the southeast rear of the home, Davila noticed a light coming from the second floor. She also heard footsteps, going up and/or down a staircase and a phone ringing from the upstairs and then stop ringing. She noticed the second floor light go off sometime during the time Wagner was knocking and announcing at the front door. She relayed all of this information to Wagner and Lopez, either by radio or by shouting. She then heard the police at the front of the residence break open the front door and enter the residence. The police found an individual identified as Matt Whaylon, asleep in one of the downstairs bedrooms. The downstairs was dark, but appeared to be in a state of construction or remodeling.

¶ 9. While some of the police officers secured the first floor, Wagner ascended the stairway to the second level flat and knocked on the door. Wagner testified that he had his gun drawn when he entered the residence and as he knocked on the second-floor door. He testified that he holstered it as Robert Artic, Sr. opened the door. There were other officers behind him who also entered the apartment. What happened after Artic opened the door was disputed. Wagner testified at the suppression hearing that after he knocked and announced "Milwaukee Police," he heard Artic say "Just a minute." Wagner then waited. Artic opened the door "after not too long a time." Wagner asked if he could come in and talk. Artic said yes. Wagner asked if anybody else was present in the residence. Artic said his lady friend was in the back room. Wagner asked if he would call her out to the kitchen where they were seated. Artic told Wagner that

140

she was not dressed. Wagner waited for her to dress and enter the kitchen. They started talking.

¶ 10. Wagner identified himself and asked if Artic owned the residence and if anyone lived downstairs. Artic told him that he owned it and was converting it into a duplex. He said that his handyman lived downstairs. Wagner explained that they had just arrested Artic's son (Rob) outside the residence in a vehicle with a large amount of cocaine. Wagner asked Artic if his son would have left any cocaine in the residence. He explained that the police had seen Rob enter and leave the residence. Artic said he did not believe his son would do something like that.

¶ 11. Wagner said he asked for permission to search and Artic said, "Yes, I have nothing to hide." Artic told Wagner that he was on supervisory release. Wagner asked Artic when he had last seen his son. Artic said he did not recall. Wagner testified that he made no threats or promises to Artic. Wagner asked Artic to acknowledge his consent to search in writing. Artic said he had no problem with the police searching, they could go ahead and check, but he refused to sign anything without a lawyer being present. Then the police searched and found cocaine.

¶ 12. Artic's version at the suppression hearing was different, but he did agree that the police knocked, identified themselves and waited when he said "just a minute." He agreed he opened the door to the police and that the first officer holstered his gun after entering. But then his version differs. He claimed he did not give consent to search and the police searched anyway.

¶ 13. During the search, they found a "California safe" of Gunk Big Pressure seal, which is a fake, pressurized can with a screw-off bottom. The can contained coffee grounds and a clear plastic bag containing

a white residue, which later tested positive for cocaine residue. The police also recovered two boxes of sandwich baggies, an open box of latex gloves, a silver Stanley-brand razor blade, a seven-inch gold metal wire, a five-pound digital scale and a shoebox with suspected cocaine residue inside. Moreover, the police noticed that the black sweater Artic was wearing had three white powdery fingerprints on the upper chest portion. This was sent to the State Crime Lab and tested positive for cocaine residue.

¶ 14. Artic was then arrested and charged. He pled not guilty and filed a motion seeking to suppress the evidence discovered during the search on the grounds that the search violated the Fourth Amendment, as it was done without a warrant, without lawful exigencies and without consent. The trial court conducted an evidentiary hearing, at which the trial court heard testimony from Wagner, Lopez, Davila and Artic. After listening to all the testimony and arguments from counsel, the trial court found that Artic's version of events was not credible. The trial court found the police and specifically, Wagner, were credible. The trial court found that exigent circumstances existed to justify the warrantless entry and search and denied the motion to suppress.

¶ 15. The case was tried to a jury in February 2007. The jury convicted Artic on both counts. The trial court sentenced him to two years on the drug trafficking count, consisting of one year in prison and one year of extended supervision. On the possession with intent to deliver count, he was sentenced to sixteen years, consisting of six years in prison and ten years of extended supervision. Artic filed a postconviction motion seeking a new trial in the interest of justice and on the grounds that his trial counsel provided ineffective

142

assistance of counsel. The trial court summarily denied the motion. Artic now appeals.

## DISCUSSION

¶ 16. This case is presented in the context of ineffective assistance of counsel. To sustain a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Sanchez*, 201 Wis. 2d 219, 236, 548 N.W.2d 69 (1996). Prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 17. Here, the alleged ineffectiveness involves what was *not* argued at the suppression hearing. Artic asserts that his trial counsel provided ineffective assistance for inadequately arguing the motion to suppress. Although trial counsel argued that there were insufficient exigencies to justify the police failure to get a search warrant, he did not argue that the police manufactured the exigencies.

¶ 18. Artic contends his trial counsel should have argued that the police impermissibly created their own exigent circumstances to justify initial entry into the duplex and made impermissible observations from the curtilage of his home, rendering the initial entry illegal and the subsequent search "fruit of the poisonous tree." He cites a variety of cases suggesting that when the police have the ability to obtain a search warrant, they should not knock on the door to alert those inside of their presence, which, in effect, creates the risk of

143

destruction of evidence that did not exist before the police made their presence known. *See United States v. Ellis*, 499 F.3d 686, 691–92 (7th Cir. 2007) (knocking and announcing without a warrant creates exigent circumstances that do not otherwise exist); *United States v. Coles*, 437 F.3d 361, 367 (3rd Cir. 2006) (instead of securing a warrant, police knocked on hotel room door, announced "police" and then heard the toilet flushing; fifth circuit rules that "exigent circumstances must exist before the police decide to knock and announce themselves at the door"). None of these cases were argued by Artic's trial counsel at the suppression motion in this case.

¶ 19. The State responds that even if the initial entry was improper, Artic cannot prove any prejudice. The State argues that because the subsequent search and seizure were lawful, any errors by trial defense counsel were not prejudicial and the conviction should be affirmed. The State argues that the trial court found that Artic consented to the search of the upper flat and the subsequent seizure of evidence was sufficiently attenuated from the initial illegal entry to be lawful. We agree with its analysis.

*A. Consent.*

¶ 20. The first question then is whether the trial court's consent finding is supported by the record. The trial court found that the search of the upstairs premises was consensual based on its finding that the police officers were credible and that Artic was not. We accept the trial court's underlying findings of fact unless they are clearly erroneous. *See State v. Eckert*, 203 Wis. 2d 497, 518, 553 N.W.2d 539 (Ct. App. 1996). In

reviewing a finding of fact based on conflicting testimony, we defer to the credibility determination of the trial court. *State v. McAllister*, 153 Wis. 2d 523, 533, 451 N.W.2d 764 (Ct. App. 1989). However, we independently determine " '[w]hether a search or seizure passes constitutional muster . . . .' " *Eckert*, 203 Wis. 2d at 518 (citation omitted).

¶ 21. In its denial of the suppression motion, the court found that Artic's testimony was not credible, that Wagner's testimony was credible and gave reasons for that finding. Our review of the record shows that Wagner's, Lopez's and Davila's suppression hearing testimony was consistent with each other and corroborated by the circumstances in the case. The police testified that they entered downstairs and started searching. Wagner then broke away and went upstairs to the closed door of Artic's residence. He knocked and identified himself. Artic said "just a minute." Wagner waited at the door and did not forcibly enter. Then Artic opened the door to the police. Artic's own testimony at the suppression hearing was in agreement with those facts. The record is uncontroverted that the entry into the upstairs residence of Artic was with Artic's express consent.

¶ 22. As to the contested facts on consent to search, again the testimony of the officer/detectives is consistent with each other and corroborated by the circumstances. Wagner testified that after Artic opened the door to him, he talked to Artic, waited for Artic's lady friend to dress and come into the kitchen, talked to Artic some more and then asked for and received verbal consent to search. He asked Artic to sign a written consent, which Artic refused to do. The trial court found this version of events to be the credible testi-

145

mony. Artic's version was that the police entered and immediately began searching. Artic denied giving verbal or written content. But Artic did admit that Wagner ripped off a yellow sheet of paper and asked him to sign a written consent, which Artic refused to do. This admission from Artic of the yellow written consent sheet corroborates Wagner's version of events. There is no reason that Wagner would rip off a yellow piece of paper for a written consent if Artic had already said "no" to consent to search. There is credible evidence to support the trial court's finding, and therefore, we uphold its determination that Artic consented to the search.

## B. Attenuation.

¶ 23. Having upheld the trial court's finding on consent, the pivotal issue here becomes whether the consensual search of Artic's upper flat was sufficiently attenuated from the initial illegal entry, so as to "purge the taint," attached to the evidence found during the consensual search. *See State v. Richter*, 2000 WI 58, ¶ 45, 235 Wis. 2d 524, 612 N.W.2d 29 (illegal entry will taint the subsequent consensual search unless consent was "sufficiently attenuated" from the illegal entry; attenuation operates to "purge the taint"). Evidence seized as a result of a Fourth Amendment violation must be suppressed as the "fruit of the poisonous tree" unless the State can show a sufficient break in the causal chain between illegality and seizure. *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963). Whether evidence should be suppressed because of a Fourth Amendment violation is a question of constitutional

fact that we decide according to a two-step standard of review. *See State v. Anderson*, 165 Wis. 2d 441, 447, 477 N.W.2d 277 (1991).

¶ 24. In assessing whether the consent overcomes the illegal entry, we apply the three-factor test of *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) and *Richter*, 235 Wis. 2d 524, ¶ 45. First, we examine "the temporal proximity of the official misconduct and seizure of evidence." *Id.* Second, we look to "the presence of intervening circumstances," and third, we examine "the purpose and flagrancy of the official misconduct." *Id.* We address each factor in turn to determine whether the "consent to search obtained after an illegal entry is sufficiently attenuated from [the] illegal entry." *Id.*

¶ 25. As to the first of the three *Richter* factors, the temporal relationship between the unlawful downstairs entry and the upstairs seizure of evidence, we look at the succession of events between those two points. There is no precise testimony as to exact length in minutes. But, there is a description of all of the events that transpired. The totality of those events show that the time between entry and consensual search in this case was more than the few minutes present in *State v. Phillips*, 218 Wis. 2d 180, 577 N.W.2d 794 (1998), where the court found that the short passage of time was not dispositive and ultimately found the search sufficiently attenuated. *Id.* at 207. Here, the number of events that transpired from the entry—start of the search downstairs, knocking at the upstairs door, waiting, entry upstairs, more waiting and talking at the kitchen table—constitute a significant temporal distance from the unlawful downstairs entry.

147

¶ 26. The second *Richter* factor is the presence of intervening circumstances. *Id.*, 235 Wis. 2d 524, ¶ 45. Here there are many intervening circumstances, but the most significant intervening circumstance is the consensual opening of the door by Artic. Even Artic's version of events agrees that the police waited after knocking and identifying themselves. He admits that he then opened the door to the police. They did not force entry or threaten to enter. They knocked and waited. But there are other intervening circumstances as well. They waited at the door, and then, waited again inside when informed that Artic's lady friend was dressing in another room of the residence not visible to police. Even this disclosure did not prompt the police to precipitously search. They waited for the lady friend to dress and come out into the kitchen. The other intervening circumstances are the conversations at the kitchen table about the home ownership, renovations, the son's arrest, Artic's status on supervised release and Artic's verbal consent to search. These intervening circumstances demonstrate that there was a significant break between the downstairs entry and upstairs search. Artic testified he was unaware of the downstairs entry circumstances. From his perspective, the chain of events began at the knock on his upstairs' door. He admitted he allowed the police into his apartment. Artic's consent to enter, the police conduct inside his residence and the substance of the conversation at the kitchen table is significant, because like the conversation in *Phillips*, *see id.*, 218 Wis. 2d at 208–09, it gave Artic sufficient information with which he could decide whether to freely consent to the search of his home. The circumstances here support the State's position of sufficient attenuation on this second factor.

148

¶ 27. The third *Richter* factor is the purpose and flagrancy of the official misconduct. *Id.*, 235 Wis. 2d 524, ¶ 45. The question is whether the police conduct, although erroneous, rose " 'to the level of conscious or flagrant misconduct requiring prophylactic exclusion' of the evidence." *Phillips*, 218 Wis. 2d at 210 (citations omitted). Here, that analysis also favors the State.

¶ 28. The police had witnessed and just arrested Artic's son (Rob) on a controlled drug buy of four and one-half ounces of cocaine. Rob had just come out of Artic's building. The police were not just on a fishing expedition. Even if the entry was unlawful, they had probable cause for a warrant, their entry was for what they considered to be the valid purpose of clearing the residence, making sure no one else was inside and talking to them if someone was there. They had no idea Artic was there, and in fact, Wagner testified at trial that he was surprised to see an elderly gentleman answer the door. They intended to get a warrant after they "secured the residence." The purpose of their entry and their intent to get a warrant did not, however, make the entry lawful; they needed a warrant, which they did not have. Thus, we analyze whether the assumed unlawful entry was nevertheless attenuated and, as we have seen, determined that it was.

¶ 29. The police knocked and properly identified themselves at the upstairs residence, did not resort to a display of force or threat, waited outside the door, talked inside and waited again in the residence. They were in street clothes but with some police markings on them. Wagner had "police" written on the back of his jacket and a badge emblem on the front side of his jacket. He had a Milwaukee police identification card

149

and his badge on a lanyard around his neck, which was visible. Although Wagner had his gun out upon entry, he immediately holstered it when Artic opened the door to him.

¶ 30. There was no evidence in the record that the police entered with an ulterior motive. There was no evidence of any bad faith on the part of the police. In their manner they were open, clearly identified themselves, explained the reason they wanted to search—due to the arrest of Artic's son—and asked for consent. There was nothing in the record to show any attempt at trickery or pressure. Wagner holstered his gun right after entry and never brought it out again. The kitchen table conversation was not contentious. The police and Artic were seated and conversing. Like the circumstances in *Phillips*, the police conduct, although in error, did not rise to a level of "conscious or flagrant misconduct." On balance it cannot be said that the police exploited their unlawful entry. All three attenuation factors favor the conclusion that the consensual search was sufficiently attenuated from the initial illegal entry. Accordingly, we hold that the consensual search of Artic's residence was sufficiently attenuated from the initial entry so as to dissipate the taint of the unlawful entry.

## CONCLUSION

¶ 31. In sum, we conclude that the trial court's finding with respect to Artic's consent to the search of the upstairs flat was not clearly erroneous. We further conclude that Artic's postconviction motion alleging ineffective assistance of counsel was properly denied as

trial counsel's failure to make the arguments alleged herein did not prejudice Artic. Accordingly, we affirm.[4]

*By the Court.*—Judgment and order affirmed.

---

[4] Based on our decision in this case, we need not address Artic's contention that the trial court should have held a *Machner* hearing. A *Machner* hearing is not required if the claim is conclusory in nature, or if the record conclusively shows the appellant is not entitled to relief. *State v. Bentley*, 201 Wis. 2d 303, 309–11, 548 N.W.2d 50 (1996). Here, the record conclusively shows that Artic is not entitled to relief.